667 A.2d 624

Patty MORRIS et al.

v.

OSMOSE WOOD PRESERVING et al.

No. 63, Sept. Term, 1994.

Court of Appeals of Maryland.

Nov. 14, 1995.

Reconsideration Denied Dec. 29, 1995.

**520**

**522**

Arnold Levin (Fred S. Longer, Levin, Fishbein, Sedran & Berman, Philadelphia, PA); Gary E. Mason (Michael D. Hausfeld, Cohen, Milstein, Hausfeld & Toll, of Washington, DC; Charles A. Schneider of Washington DC; Harold Berger, Janice Siegel, Berger & Montague, P.C., Philadelphia, PA; Steven M. Pavsner Joseph, Greenwald & Laake, P.A., Greenbelt) all on brief; John H. Nethercut, Assistant Attorney General, Consumer Protection Division (J. Joseph Curran, Jr., Attorney General, both on brief), Baltimore, for Petitioner.

Christopher Scott D'Angelo (Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA), H. Patrick Donohue (Armstrong, Donohue & Ceppos, of Rockville, MD, on brief), liaison counsel and for respondent Hoover Universal, Inc.

Read K. McCaffrey (Andrew J. Toland, Patton Boggs, L.L.P. of Baltimore, on brief), for respondent Osmose Wood Preserving, Inc.

Andrew T. Berry (Patrick J. Perrone, McCarter & English, both on brief), Newark, NJ, Phillip C. Jacobson (Anderson, Coe & King, of Baltimore, MD, on brief), for respondent Hoover Treated Wood Products, Inc.

Jack E. McClard, Hunton & Williams, of Richmond, VA, Mark B. Bierbower, Hunton & Williams, of Washington, DC, Benjamin V. Madison, III, Hunton & Williams, of Norfolk, VA, Michael T. Wharton, Debra S. Block, Wharton, Levin, Ehrmantraut, Klein & Nash, P.A., of Annapolis, MD, Michael J. McManus, Warren Lutz, Jackson & Campbell, P.C., of Washington, DC, amicus curiae.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

MURPHY, Chief Judge.

Plaintiffs' products liability tort claims in this case seek recovery for purely economic loss associated with the alleged

deterioration of plywood in the roofs of their townhouses. The principal issue is whether their claims come within the exception for conditions "presenting a clear danger of death or personal injury," which we adopted in *Council of Co–Owners v. Whiting–Turner,* 308 Md. 18, 35 n. 5, 517 A.2d 336 (1986). In addition, we must determine whether the plaintiff home buyers may maintain an action under Maryland's Consumer Protection Act against manufacturers or sellers with whom the plaintiffs had no direct contact. Further, we consider whether Maryland's version of the Uniform Commercial Code (UCC) permits plaintiffs' implied warranty claims.

## I.

## A.

Plaintiffs brought this class action suit to recover from the defendants the cost of replacing roofs that contained allegedly defective fire retardant treated plywood ("FRT plywood").[1] According to the complaint, on November 3, 1987, plaintiff Patty Morris purchased a townhouse that had a roof constructed of FRT plywood manufactured by defendant Osmose Wood Preserving (Osmose). On October 23, 1987, plaintiff Richard Mills purchased a townhouse that also had a roof constructed of FRT plywood manufactured by Osmose. On July 11, 1985, plaintiff Michael Karbeling purchased a townhouse that had a roof constructed of FRT plywood manufactured by defendant Hoover Treated Wood Products, Inc. (Hoover Wood). On September 28, 1983, plaintiff Laura Herlihy purchased a townhouse that had a roof constructed of FRT plywood manufactured by defendant Hoover Universal, Inc. (Hoover Universal).[2]

---

1. The complaint describes the class as
 "[a]ll present owners of roofs or buildings, including townhouses, in the State of Maryland and in the United States, where the roofs were at any time constructed with fire retardant treated plywood, manufactured, treated, produced, tested, inspected, marketed and/or sold by Osmose Wood Preserving, Inc, [sic] Hoover Universal, Inc. or Hoover Treated Wood Products, Inc., and prior owners of said buildings who have paid for the inspection, replacement or repair of said buildings' roofs."
 The circuit court dismissed the complaint before the class was certified.

2. According to the complaint, Hoover Universal sold the assets of its wood preserving division to Hoover Wood on September 28, 1983.

Plaintiffs allege in their Fourth Amended Complaint that FRT plywood, when exposed to high temperatures, begins an acidic reaction that was designed to stop the spread of fire. It was further alleged that the reaction can occur at temperatures as low as 130 degrees fahrenheit, and roofs can reach temperatures of 180 degrees fahrenheit without the presence of fire. Plaintiffs aver that the chemical reaction "weakens the wood and destroys the bonding between the plywood laminates, thereby causing the wood, among other things, to bow, darken, spot, warp, fracture and otherwise deteriorate and lose strength capacity." This reaction, the plaintiffs claim, will inevitably occur in plywood installed in roofs, and it will occur without regard to ventilation or moisture levels in attics.

The plaintiffs allege in their amended complaint that the plywood in plaintiffs' roofs has undergone this reaction, "significantly weakening the roofs and resulting in substantial impairment of the strength and structural integrity of the roofs, and damaging other components of the roofs in which it is incorporated." Plaintiffs allege, therefore, that the roofs are "unsafe and dangerous" and "at risk of premature failure." They further assert that "[t]here is an immediate threat of injury from walking on the roofs, and also the threat of the roofs collapsing and injuring the occupants within," and that the roofs cannot support "any weight, even a heavy snowfall." [3]

---

Under the terms of the sale, Hoover Universal retained liabilities for products sold prior to the sale of the assets.

**3.** The plaintiffs, in a previous version of the complaint, alleged that Plaintiff Herlihy had been warned to stay off of her roof because of the FRT plywood. *See infra* note 4 (explaining the procedural history of the case prior to the current version of the complaint). They also alleged that local fire departments have cautioned fire fighters not to walk on roofs containing FRT plywood. Further, they alleged that "[t]here have been instances where homeowners and others have fallen through roofs constructed of defendants' FRT plywood while attempting to perform maintenance work on these roofs." After the defendants filed a motion to strike certain irrelevant and scandalous statements from the complaint, and Judge Cave, at a hearing on September 25, 1992, stated that "much of what is contained in the complaint ... isn't necessary to put

According to the complaint, the defendants each had advertised their products as suitable for constructing roofs, when in fact they were not. On March 30, 1986, the American Plywood Association (the Association) informed Hoover Wood of a situation in which its FRT plywood had deteriorated despite adequate ventilation. In April 1987, the Association notified all defendants of the thermal degradation problems associated with FRT plywood. The general public was alerted to the problem in the spring of 1990, most notably by an article on the front page of the *New York Times* dated April 11, 1990. Plaintiffs allege that they would have become aware of the problem sooner if the defendants had not controlled all information concerning it.

## B.

Based on these facts, the fourth amended complaint contained five counts: strict liability, negligence, breach of implied warranties, negligent misrepresentation, and violations of the Maryland Consumer Protection Act, Maryland Code (1975, 1990 Repl.Vol., 1995 Supp.) § 13–101 through § 13–411 of the Commercial Law Article.[4] After a hearing on defen-

---

into the complaint," plaintiffs omitted these allegations from their fourth and final amended complaint.

**4.** The plaintiffs Morris, Mills, and Herlihy filed the original complaint on January 9, 1991, against all present defendants. The complaint contained five counts, including (I) strict liability, (II) negligence, (III) breach of implied warranties, (IV) negligent misrepresentation, and (V) violations of state consumer protection acts. On February 12, 1991, Morris, Mills, and Herlihy filed a first amended complaint, which added Johnson Controls, Inc. as a defendant. The first amended complaint prompted motions by all defendants to dismiss. On May 17, 1991, before the court ruled on the motions to dismiss, plaintiff Karbeling joined Morris, Mills, and Herlihy in filing a second amended complaint, which also prompted motions to dismiss from all defendants. After a hearing, the court (McKenna, J.) ordered:

1. that all claims against Johnson Controls, Inc., be dismissed;
2. that all tort counts (strict liability, negligence, and negligent misrepresentation) against all remaining defendants be dismissed;
3. that the breach of implied warranty count against Hoover Universal and Hoover Wood be dismissed because they are barred by the statute of limitations;

dants' motions to dismiss, the circuit court dismissed the complaint in its entirety. It ruled that the strict liability and negligence counts were precluded by the economic loss rule, which prohibits a plaintiff from recovering in tort for purely economic losses—losses that involve neither a clear danger of physical injury or death, nor damage to property other than the product itself. The court further ruled that these claims did not come within Maryland's limited exception to the economic loss rule because "[a]t the time of the sale by defendants to the developers, the FRT plywood was not so defective as to present a clear and imminent danger of death or personal injury to the ultimate purchaser of the home." Concerning the implied warranty count, the court stated that all plaintiffs had conceded that their claims were not filed within the four year limitations period contained in Maryland Code (1975, 1992 Repl.Vol.), § 2–725 of the Commercial Law Article, and rejected plaintiffs' argument that the statute of limitations should be tolled because the defendants had fraudulently concealed the cause of action under Code (1973, 1989 Repl.Vol.) § 5–203 of the Courts and Judicial Proceedings Article. Citing the absence of "reliance by the plaintiff[s] on the particular statements" of the defendants, the court dismissed the negligent misrepresentation count. The court also implied, but did not state, that the absence of particular

4. that Osmose's motion to dismiss the implied warranty count be denied as to any claims concerning plywood delivered on or after January 9, 1987;
5. that Osmose's motion for a more definite statement as to the implied warranty count be granted;
6. that defendants' motions to dismiss the Consumer Protection act count be denied;
7. that defendants' motions for a more definite statement as to the Consumer Protection Act count be granted.

Despite this dismissal with prejudice of some of the counts, plaintiffs filed a third amended complaint, reasserting all counts against Osmose, Hoover Universal, and Hoover Wood and adding a specific count for violations of the Maryland Consumer Protection Act (Count V), separate from the count based on unspecified state consumer protection acts (Count VI). Defendants filed motions to dismiss. After a hearing on the motions, but before a ruling, the plaintiffs filed the fourth amended complaint, omitting Count VI and some statements claimed by the defendants to be scandalous or impertinent.

reliance prompted its dismissal of the Consumer Protection Act count.[5]

The Court of Special Appeals reversed the dismissal of the breach of implied warranty count, and affirmed the dismissals of the other counts. *Morris v. Osmose Wood Preserving*, 99 Md.App. 646, 639 A.2d 147 (1994). Concerning the tort claims, the court held that the economic loss rule barred recovery. It rejected the plaintiffs' attempts to fit their claims into Maryland's limited exception for severe risk of personal injury, stating: "Mere possibilities ... do not meet the threshold of establishing a clear danger of death or personal injury." *Id.* at 655–56, 639 A.2d 147.

With respect to the Maryland Consumer Protection Act count, the court held that, while the plaintiffs had alleged sufficient reliance, they could not maintain an action under the Act because the FRT plywood was not consumer goods at the time the defendants sold it to the builders. *Id.* at 660, 639 A.2d 147. The court stated that "when [the defendants] advertised and sold FRT plywood, they advertised and sold it to commercial buyers for commercial purposes," i.e., "the mass construction of homes." *Id.* Furthermore, the court held that under the UCC concept of goods, "the FRT plywood ... did not become 'consumer goods' when the houses into which it was incorporated were sold to [the plaintiffs]." *Id.* at 661, 639 A.2d 147.

As to the implied warranty count, the court pointed out the apparent error in the circuit court's statement that the plaintiffs had conceded that their warranty claims were not filed within the applicable limitations period. The court noted that Morris and Mills purchased their homes in the fall of 1987 and filed their claim in January of 1991, well within the limitations period. Next, the court held that Herlihy and Karbeling had alleged facts sufficient to toll the statute of limitations based on fraudulent concealment. Also, relying on the expansive

---

**5.** The court mistakenly assumed that Judge McKenna had previously dismissed the Consumer Protection Act claim, and "decline[d] to disturb the dismissal" of that count.

definition of "seller" in the UCC, the court rejected Osmose's argument that it was not a "seller" under the UCC.

## II.

In considering a motion to dismiss filed under Maryland Rule 2–322(b)(2) for "failure to state a claim upon which relief can be granted," a court must assume the truth of all well-pleaded facts and allegations in the complaint, as well as all inferences that can reasonably be drawn from them. *Decoster v. Westinghouse,* 333 Md. 245, 249, 634 A.2d 1330 (1994); *Stone v. Chicago Title Ins.,* 330 Md. 329, 333, 624 A.2d 496 (1993); *Faya v. Almaraz,* 329 Md. 435, 443–44, 620 A.2d 327 (1993). Dismissal is proper only when the alleged facts and permissible inferences, even if later proven to be true, would fail to afford relief to the plaintiff. *Board of Education v. Browning,* 333 Md. 281, 286, 635 A.2d 373 (1994); *Decoster, supra,* 333 Md. at 249, 634 A.2d 1330; *Faya, supra,* 329 Md. at 443, 620 A.2d 327. We do not consider, however, merely conclusory charges that are not factual allegations. *Faya, supra,* 329 Md. at 444, 620 A.2d 327; *Berman v. Karvounis,* 308 Md. 259, 265, 518 A.2d 726 (1987).

## III.

We have categorized losses in products liability claims as either (1) personal injuries, (2) physical harm to property other than the product itself, or (3) economic loss suffered when the product fails to meet the contractual expectations of the purchaser. *Decoster, supra,* 333 Md. at 249–50, 634 A.2d 1330. Generally, plaintiffs cannot recover in tort for losses in the third category—purely economic losses. *U.S. Gypsum v. Baltimore,* 336 Md. 145, 156, 647 A.2d 405 (1994). Such losses are often the result of some breach of contract and ordinarily should be recovered in contract actions, including actions based on breach of implied or express warranties. *Id.* This economic loss rule was justified as follows by Chief Justice Traynor for the Supreme Court of California in the seminal

case of *Seely v. White Motor Company*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145, 155 (1965):

"The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the 'luck' of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He can not be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands. A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will."

In *Council of Co–Owners v. Whiting–Turner*, 308 Md. 18, 32–35, 517 A.2d 336 (1986), we shifted the focus of the economic loss analysis in Maryland, holding that "the determination of whether a duty [in tort] will be imposed in [an economic loss case] should depend upon the risk generated by the negligent conduct, rather than upon the fortuitous circumstance of the nature of the resultant damage." *Id.* at 35, 517 A.2d 336. We then clarified the nature of the risk required to maintain a tort action for purely economic loss, stating that "[w]here the risk is of death or personal injury the [tort] action will lie for recovery of the reasonable cost of correcting the dangerous condition." *Id.* We further explained:

"It is the serious nature of the risk that persuades us to recognize the cause of action in the absence of actual injury. Accordingly, conditions that present a risk to general health, welfare, or comfort but fall short of presenting a clear danger of death or personal injury will not suffice. A claim that defective design or construction has produced a

drafty condition that may lead to a cold or pneumonia would not be sufficient."

*Id.* at 35 n. 5, 517 A.2d 336.

Based on *Whiting–Turner*, the plaintiffs argue that we should permit their tort claims to proceed because the roofs present a risk of personal injury. The roofs, plaintiffs argue, cannot support weight and therefore create a risk of physical injury to anyone who goes on them (homeowners, repairmen, or firefighters) and to anyone who may be under them if they collapse under the weight of a heavy snowfall or a strong wind gust. Defendants argue that the risk is not clear enough to bring the claim within the *Whiting–Turner* exception. Alternatively, they argue that we should abandon the exception or limit its application to cases involving claims against builders or architects.

*Whiting–Turner* and *U.S. Gypsum*, considered together, reveal a two part approach to determine the degree of risk required to circumvent the economic loss rule. We examine both the nature of the damage threatened and the probability of damage occurring to determine whether the two, viewed together, exhibit a clear, serious, and unreasonable risk of death or personal injury. Thus, if the possible injury is extraordinarily severe, i.e., multiple deaths, we do not require the probability of the injury occurring to be as high as we would require if the injury threatened were less severe, i.e. a broken leg or damage to property. Likewise, if the probability of the injury occurring is extraordinarily high, we do not require the injury to be as severe as we would if the probability of injury were lower.

*Whiting–Turner* primarily involved the severity component. In that case, the plaintiffs alleged that the defendants built a twenty-one story condominium building without constructing "ten vertical utility shafts with materials having a fire resistance rating of two hours." 308 Md. at 22, 517 A.2d 336. The defect put all of the residents of the building at risk of death or personal injury in the event that a fire occurred in one of the shafts. Even though no fire had actually occurred and the

probability that the defect would cause the fire was not extraordinarily high, we allowed the plaintiffs to maintain a tort action because the nature of the possible damage was very serious—multiple deaths and personal injuries.

*U.S. Gypsum* implicated the probability element to a greater extent than *Whiting–Turner* had. In that case, the City of Baltimore sued companies that had been involved in the manufacturing, distribution, and installation of asbestos products that were present in several of Baltimore City's public buildings. The possible injury—inhalation of asbestos fibers causing serious diseases—was coupled with a high probability that personal injuries thereby would result because everyone who used the building could have been exposed to asbestos fibers in the air. Accordingly, we held the tort claims to be "fully cognizable." [6]

This two part approach recognizes the negative effects that could occur if the economic loss rule was abandoned. *See East River S.S. Corp. v. Transamerica Delaval,* 476 U.S. 858, 870–71, 106 S.Ct. 2295, 2302, 90 L.Ed.2d 865 (stating that an approach rejecting the economic loss rule "fails to account for the need to keep products liability and contract law in separate spheres and to maintain a realistic limitation on damages"). It balances these considerations, however, against the public policy of encouraging people to correct dangerous conditions before a tragedy results.[7] Accordingly, we do not

---

**6.** We found particularly persuasive the decision of the Supreme Court of Minnesota in *80 S. 8th St. Ltd. Ptsp. v. Carey–Canada,* 486 N.W.2d 393 (Minn.1992). *U.S. Gypsum, supra,* 336 Md. at 156, 647 A.2d 405. We explained that the Minnesota court had allowed "plaintiffs to proceed in tort based on allegations that the asbestos-containing materials posed a substantial and unreasonable risk of personal injury to building users." *Id.* at 157, 647 A.2d 405.

**7.** In *Whiting–Turner, supra,* 308 Md. at 35, 517 A.2d 336, we found the reasoning of the Indiana Supreme Court in *Barnes v. Mac Brown and Company,* 264 Ind. 227, 342 N.E.2d 619 (Ind.1976), to be persuasive. The court had stated:

"If there is a defect in a stairway and the purchaser repairs the defect and suffers an economic loss, should he fail to recover because he did not wait until he or some member of his family fell down the stairs

ordinarily allow tort claims for purely economic losses. But when those losses are coupled with a *serious* risk of death or personal injury resulting from a dangerous condition, we allow recovery in tort to encourage correction of the dangerous condition.

Moreover, this approach easily withstands the criticism of the United States Supreme Court, which characterized approaches based on the degree of risk as "too indeterminate to enable manufacturers easily to structure their business behavior." *East River, supra,* 476 U.S. at 870, 106 S.Ct. at 2301–02. As we see it, there are two areas in which manufacturers' exposure to tort liability requires them to modify their business behavior, and our risk-of-harm rule does not cause major disruptions in either area. The first area is the actual manufacturing and marketing of the product, in which manufacturers, regardless of the extent of tort liability, should always attempt to mitigate risks of death or personal injury. The second area is the allocation of funds to cover potential tort liability. In this area, our rule, because of the extreme nature of the risk required to trigger it, limits liability to, predominately, those situations in which either liability would inevitably be created by actual physical injury or the manufacturer's exposure to liability is so great that it cannot be ignored.

 In the instant case, the complaint asserts two instances in which the FRT plywood may cause personal injury. In the first, "[b]ecause of the degradation and deterioration of the FRT plywood, the roofs are unsafe and dangerous, threatening the safety of the plaintiffs and other occupants of the buildings and other persons who have cause to be on the

---

and broke his neck? Does the law penalize those who are alert and prevent injury? Should it not put those who prevent personal injury on the same level as those who fail to anticipate it?"
*Id.* 342 N.E.2d at 621.

Likewise, in *U.S. Gypsum, supra,* we stated: " 'Rather than waiting for an occupant or user of the building to develop an asbestos-related injury, we believe building owners should be encouraged to abate the hazard to protect the public.' " *Id.* at 158, 647 A.2d 405 (quoting *80 S. 8th, supra,* 486 N.W.2d at 398).

roofs." In the second, occupants of a townhouse may be injured "as the degradation process renders the roofs incapable of supporting any weight, even a heavy snowfall," thereby posing "the threat of the roofs collapsing and injuring the occupants therein."

■ Neither of these assertions, by themselves, meet the required legal threshold of pleading the existence of a clear and extreme danger of death or *serious* personal injury, as required by *Whiting–Turner* and its progeny. There is no allegation that any injury has ever occurred since the roofs were installed on the plaintiffs' townhouses, or on the roofs of the members of the class, or that any of the roofs have collapsed because of weather conditions or because of the alleged degradation associated with their construction. As noted by the Court of Special Appeals, mere possibilities are legally insufficient to allege the existence of a clear danger of death or *serious* personal injury. Our cases emphasize that it is the *serious* nature of the risk that compels recognition of a cause of action in tort for economic loss, absent actual injury. See *Whiting–Turner, supra*, 308 Md. at 35, n. 5, 517 A.2d 336. To lower the threshold to encompass mere "possibilities" of injury, as presented in this case, and as the dissent seemingly advocates, is to "cheapen" the legitimacy of the exception to the economic loss rule and thereby invite an avalanche of such tort claims in future cases. In sum, we affirm the dismissal of the plaintiffs' tort claims because the alleged defects do not present a substantial risk of death or serious physical injury.

## IV.

The General Assembly enacted the Consumer Protection Act (CPA or the Act) in response to "mounting concern over the increase of deceptive practices in connection with sales of merchandise, real property, and services and the extension of credit." Code (1975, 1990 Repl.Vol.) § 13–102(a)(1) of the

Commercial Law Article.[8] The Legislature was concerned that these deceptive practices were undermining public confidence in merchants, "although the majority of business people operate with integrity and sincere regard for the consumer." § 13–102(b)(2). It found existing federal and State laws to be "inadequate, poorly coordinated and not widely known or adequately enforced," and found "that improved enforcement procedures [were] necessary to help alleviate the growing problem of deceptive consumer practices." § 13–102(a)(2), (3). With the Act, therefore, the General Assembly intended "to set certain minimum statewide standards for the protection of consumers across the State" and to "take strong protective and preventative steps to investigate unlawful consumer practices, to assist the public in obtaining relief from these practices, and to prevent these practices from occurring in Maryland." § 13–102(b)(1), (3).

The Act prohibits certain unfair and deceptive trade practices "in [t]he sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services; [or] [t]he offer for sale, lease, rental, loan, or bailment of consumer goods, consumer realty, or consumer services...."[9] § 13–

---

**8.** All statutory references in this portion of the opinion refer to Code (1975, 1990 Repl.Vol.), Commercial Law Article, unless otherwise indicated.

**9.** In the present case, plaintiffs have alleged that defendants have engaged in the following unfair and deceptive trade practices, which are listed in § 13–301:

(1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;

(2) Representation that:

(i) Consumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have;

\* \* \* \* \* \*

(iv) Consumer goods, consumer realty, or consumer services are of a particular standard, quality, grade, style, or model which they are not;

303. It defines sales to include not only sales, but also offers and attempts to sell. § 13–101(i). It defines consumer goods as goods "which are primarily for personal, household, family, or agricultural purposes." § 13–101(d).

The Act created the Division of Consumer Protection of the Office of the Attorney General and gave it "broad powers to enforce the CPA, including the ability to seek injunctions, cease and desist orders, restitution, and civil penalties." *CitaraManis v. Hallowell*, 328 Md. 142, 150, 613 A.2d 964 (1992) (citing §§ 13–401 through 13–406 and 13–410). Furthermore, the Act provides for private causes of action against violators, stating: "In addition to any action by the Division or Attorney General authorized by this title and any other action otherwise authorized by law, any person may bring an action to recover for injury or loss sustained by him as the result of a practice prohibited by this title." § 13–408(a).[10]

We must decide whether the allegations in this case, if true, are sufficient to establish that the defendants engaged in unfair and deceptive trade practices in connection with sales, offers for sale, or attempts to sell consumer goods, and, if so, whether the plaintiffs were injured as a result of these practices. This is essentially a question of statutory

---

(3) Failure to state a material fact if the failure deceives or tends to deceive;

\* \* \* \* \* \*

(9) Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with:

(i) The promotion or sale of any consumer goods, consumer realty, or consumer service;

\* \* \* \* \* \*

10. We have held that a private party suing under the CPA must establish actual injury or loss, despite the language in § 13–302, which states: "Any practice prohibited by this title is a violation of this title, whether or not any consumer in fact has been misled, deceived, or damaged as a result of that practice." *CitaraManis, supra*, 328 Md. at 151–53, 613 A.2d 964.

construction, the goal of which is to determine the General Assembly's intent in enacting the legislation. *Parrison v. State*, 335 Md. 554, 559, 644 A.2d 537 (1994). We determine legislative intent primarily by reference to the plain language of the statute. *Outmezguine v. State*, 335 Md. 20, 41, 641 A.2d 870 (1994). In doing so, however, we cannot view individual provisions in isolation, but must look at the entire statutory scheme. *Id.* Also, a statute "must be construed in accordance with its general purposes and policies." *Rose v. Fox Pool*, 335 Md. 351, 359, 643 A.2d 906 (1994). Moreover, " 'results that are unreasonable, illogical, or inconsistent with common sense should be avoided whenever possible consistent with the statutory language. . . .' " *Motor Vehicle Admin. v. Gaddy*, 335 Md. 342, 347, 643 A.2d 442 (1994) (quoting *Motor Vehicle Admin. v. Shrader*, 324 Md. 454, 463, 597 A.2d 939 (1991)). Finally, the CPA specifically provides that it is to be "construed and applied liberally to promote its purpose." § 13–105.

The plaintiffs argue that the Court of Special Appeals erred in applying the UCC definition of "consumer goods" to that contained in the CPA because the two statutes have different purposes and slightly different definitions of the term. They contend that under the CPA, a thing can be consumer goods if it is eventually intended to be for personal, household, or family purposes. Therefore, they argue that when the manufacturers sold the FRT plywood to the builders, these were sales of consumer goods because the parties intended that the plywood would be used in residential townhouses. The plaintiffs insist that they can maintain an action under the CPA if they can establish unfair and deceptive trade practices in connection with the sales of plywood by the defendants to the builders. They further argue that the causation requirement in § 13–408(a) does not require that they directly relied on the deceptive statements made in connection with the sale to the builders.

To the contrary, defendants argue that the causation requirement does require plaintiffs to prove direct reliance on the deceptive statements. Further, defendants argue that the

alleged unfair and deceptive trade practices were not in connection with any sale or offer for sale of consumer goods.

The definition of consumer goods in the CPA differs from the definition in the UCC. While the UCC requires the goods to be "used or bought for use primarily for personal, family or household purposes" (Code, (1975, 1992 Repl.Vol.) § 9–109 of the Commercial Law Article), the CPA requires only that they be "primarily for personal, household, family, or agricultural purposes." § 13–101(d). Essentially, this difference in language allows goods to be considered consumer goods under the CPA before they are actually bought or used for personal, household, or family purposes. Under the UCC definition, a merchant could never commit an unfair or deceptive trade practice in the offer for sale of consumer goods because a merchant does not offer to sell consumer goods; it offers to sell its inventory. *See* § 9–109 (describing the various types of goods). Therefore, the UCC definition, while similar to the CPA definition, would not be entirely workable under the CPA.

The plaintiffs' expansive definition of consumer goods is, however, also unworkable in that it would consider the plywood to have been consumer goods at the time defendants sold it to the builders. If this were the case, the builders could sue the manufacturers under the CPA because builders come within the broad category of "any person" in § 13–408(a), and they sustained injury, if they were sold a defective product. This injury occurred before, and regardless of, the alleged injury to the plaintiffs. Such suits between builders and manufacturers would serve only to reallocate the risks of loss under their contracts without providing any additional protection to consumers. Because these suits would not serve the purposes of the Act—"protection of consumers" and assisting "the public in obtaining relief from [unlawful consumer] practices"—we conclude that the legislature did not intend to allow them. *See* § 13–102(b) (listing the purposes of the act).

The only reasonable definition of consumer goods is goods sold or offered for sale to persons who intend to use

them primarily for personal, family, household, or agricultural purposes. A sale of consumer goods under the CPA is, therefore, a sale in which the buyer intends to use the goods primarily for these purposes. Consequently, the deceptive trade practice must occur in the sale or offer for sale to the consumer.

By this we do not mean that the only entity that can engage in a deceptive trade practice is one who directly sells or offers to sell to consumers. It is quite possible that a deceptive trade practice committed by someone who is not the seller would so infect the sale or offer for sale to a consumer that the law would deem the practice to have been committed "in" the sale or offer for sale. *See* § 13–303. An example may be a deceptive statement appearing on a manufacturer's packaging that is targeted to consumers. Under such circumstances, the CPA may provide a claim against the manufacturer because the statements were made in the sale or offer for sale of the consumer goods. For other examples see *State v. Cottman Transmissions*, 86 Md.App. 714, 587 A.2d 1190 (1991) (permitting CPA action against franchiser who directed franchisee to engage in deceptive practices), *cert. denied,* 324 Md. 121, 596 A.2d 627 (1991); *Valley Forge Towers v. Ron–Ike F. Ins.*, 393 Pa.Super. 339, 574 A.2d 641 (1990) (permitting consumer's action against manufacturer when contract specified a particular manufacturer's roofing product and promised a direct manufacturer's warranty which the manufacturer issued directly to plaintiffs and later refused to honor), *aff'd,* 529 Pa. 512, 605 A.2d 798 (1992); *State v. Custom Pools*, 150 Vt. 533, 556 A.2d 72 (1988) (allowing consumer's action against finance company that assisted a pool sales company in fraudulently obtaining mortgage deeds on consumers' homes).

Nevertheless, the deceptive practice must occur in the sale or offer for sale to consumers. In this case, the allegedly deceptive practices occurred entirely during the marketing of the plywood to the builders. Essentially, the defendants represented in advertising targeted to builders that their products were suitable for roofing, and plaintiffs claim this

representation is untrue. There is no allegation that the defendants were in any way involved in selling, offering, or advertising the townhouses that the plaintiffs bought. Nor is there any allegation that defendants attempted to influence the plaintiffs to purchase townhomes containing their brand of plywood. The only effect the alleged misrepresentations had on the sale of the townhouses was the creation of a possibly erroneous belief on the part of the builders which caused them to include allegedly inferior products in the townhouse. This remote effect on the sale of consumer realty is not sufficient for us to conclude that the deceptive trade practice actually occurred in that sale. Therefore, we affirm the dismissal of plaintiffs' claims under the Maryland Consumer Protection Act.

The dissent maintains that the CPA should allow the eventual consumers of a product to sue for misrepresentations made by manufacturers to anyone in the chain of distribution. Thus, the dissent's position would allow consumers to sue for misrepresentations made by any manufacturer of a component part to another manufacturer, so long as the component part was eventually included in the product purchased by the consumer. This view is neither in accord with the language or the purpose of the CPA. The cases cited by the dissent to support its position construe statutes different from Maryland's CPA, and apply those statutes to factual circumstances different from those before us.

In three of the cases cited by the dissent, the consumer's cause of action was allowed to proceed only because specific statutory language made the manufacturer's alleged misrepresentation "indirectly" a part of the sale to the consumer. In *Pack & Process, Inc. v. Celotex Corp.*, 503 A.2d 646, 658 (Del.Super.1985), a statute allowing consumers to recover damages for unlawful practices made "in connection with the sale or advertisement of any merchandise" was applied to statements made by a roofing manufacturer to a roofing contractor and the original consumer, who later sold the building to the plaintiff. The decision rested upon a holding that " 'in connection with' is a phrase suggesting a broad

interpretation of how involved with the distribution of merchandise a consumer has to be in order to bring a cause of action under the statute." *Id.* at 658. The manufacturer's misrepresentations were found to have been made "in connection with" the sale to the consumer. Maryland's CPA on the other hand, does not sweep as broadly as the language at issue in *Pack & Process. See* § 13–303 (prohibiting unfair or deceptive trade practices made "in" sale of goods).

The consumer's action for alleged misrepresentations made by a drug manufacturer to a physician in *Jones v. Sportelli,* 166 N.J.Super. 383, 390, 399 A.2d 1047 (1979), rested upon the New Jersey statute's definition of the term "sale," which had been "liberally expanded by the Legislature" and encompassed "any 'attempt directly or indirectly to sell.' " Because the patient was indirectly charged with the cost of the medicine, the court found that the manufacturer had "indirectly" sold the medicine to the consumer. *See id. Kociemba v. G.D. Searle & Co.,* 680 F.Supp. 1293, 1305 (D.Minn.1988), adopted the same reasoning, on the ground that "the New Jersey statute cited in *Jones* is similarly worded to [the Minnesota statute at issue] to the extent that both statutes cover 'direct and indirect' outreaches to the public." Thus, the actions in *Jones* and *Kociemba* did not proceed upon the basis of misrepresentations made in the sale from the manufacturer to the physician, but on the basis of misrepresentations made in an "indirect" sale between the manufacturer and the consumer. The analogous portion of Maryland's statute does not define "sale" to encompass "indirect" attempts to sell. § 13–101(i).

The alleged misrepresentations regarding the plywood at issue in this case are vastly different from the incorrect odometer readings at issue in *State of Utah by Wilkinson v. B & H Auto,* 701 F.Supp. 201, 204 (D.Utah 1988). The deceptive statement in *Wilkinson* was the odometer reading of used cars that were eventually sold to the plaintiffs. As with a deceptive statement on a label affixed by a manufacturer and passed along to the consumer, the odometer reading was transmitted *verbatim* to the consumer. Thus, the defendant's statement

was necessarily and directly transmitted to the consumer as a part of the sale to the consumer.

The dissent asserts that consumers "may" rely on a misrepresentation made by a manufacturer to another manufacturer or a supplier, because "[o]ften the manufacturer's representations will be repeated by the intermediate seller, or the intermediate seller will show the manufacturer's advertising to the consumer." This concern, however, cannot justify the broad sweep of the rule advocated by the dissent, or the imposition of liability under the CPA in this case. An intermediate seller who provides false or deceptive information to a consumer is directly liable under the CPA. Sections 13–301 to 13–303 provide no exceptions for sellers who simply adopt false statements told to them by others. By giving consumers a cause of action against manufacturers for statements made to other manufacturers, the rule proposed by the dissent would re-write warranty law as it applies to any product that could be ultimately incorporated into a product used by consumers.

## V.

The question presented to us in the cross-appeal concerns whether the plaintiffs have alleged facts sufficient to establish fraudulent concealment that would toll the four year statute of limitations contained in Maryland's version of the UCC on sales. *See* Code (1975, 1992 Repl.Vol.), § 2–725 of the Commercial Law Article.[11] We are unable to reach this issue, however, because the record does not reflect the dates on which sales of goods occurred. These dates are vital to the question before us because they mark the accrual of the cause of action. Indeed, the record could not reflect such dates because the plaintiffs have not alleged any sales of goods under which the defendants made implied warranties to the plaintiffs.

---

11. All statutory references in this portion of the opinion refer to Code (1975, 1992 Repl. Vol.), Commercial Law Article, unless otherwise indicated.

Because the plaintiffs have no direct contracts with the defendants, they lack the privity that ordinarily has been required to maintain a contract action. *See, e.g., Phipps v. General Motors Corp.,* 278 Md. 337, 349, 363 A.2d 955 (1976). Maryland's UCC abolished the privity requirement in many circumstances, but not in the circumstances of this case. So called "vertical" privity, has been abolished for actions by the *buyer.* § 2–314(1)(b). A buyer is "a person who buys or contracts to buy *goods.*" *Id.* § 2–103(1)(a) (emphasis added). Therefore, the buyer of goods can sue anyone listed in § 2–314(1)(a), which includes essentially the entire distribution chain.

The plaintiffs in this case, however, were never buyers in a contract for the sale of goods. Under § 2–105, goods are "all things ... which are *movable* at the time of identification to the contract for sale...." (Emphasis added). When the defendants sold plywood to the builders, it was unquestionably a sale of goods, giving the builders the right to sue under the UCC's implied warranties. The builders built houses, incorporating the plywood into the roofs. At this point, the plywood ceased to be goods because it became a permanently affixed part of a townhouse and was thereafter not movable. Plaintiffs bought the plywood only as part of a sale of an entire house and only after the plywood had been permanently incorporated into the house. Therefore, when the plaintiffs bought their houses, the plywood was not goods; it was part of the real estate.

The only contracts for the sale of goods occurred between the defendants and the builders. Plaintiffs cannot sue for a breach of these contracts unless they can circumvent the so called "horizontal" privity requirement. This requirement has been abolished by § 2–318 for any person who is an "ultimate consumer or user of the goods or person affected thereby if it is reasonable to expect that such person may use, consume or be affected by the goods *and who is injured in person by breach of the warranty.*" (Emphasis added). The General Assembly specifically chose this language over anoth-

er option, known as the "third alternative," which would have extended "the rule beyond injuries to the person." § 2–318, comment 3. Therefore, the plaintiffs must be "injured in person" before they can sue, as foreseeable consumers or users of the product, under the warranties made in the contract between the defendants and the builders.

Maryland law also recognizes implied warranties for new home sales similar to those in the UCC. *See* Code (1974, 1988 Repl.Vol., 1994 Cum.Supp.), § 10–201 through 10–204 of the Real Property Article. The plaintiffs, however, cannot sue these defendants under the new home warranties because the warranties are given only by builders and real estate brokers, not by manufacturers of construction materials. *Id.* §§ 10–201, 10–203. Moreover, there are ordinarily no other warranties implied in the sale of a house. *Loch Hill Constr. Co. v. Fricke*, 284 Md. 708, 713, 399 A.2d 883 (1979); *Neary v. Posner*, 253 Md. 401, 405, 252 A.2d 843 (1969); *Allen v. Wilkinson*, 250 Md. 395, 398, 243 A.2d 515 (1968).

Accordingly, we agree with the trial court's dismissal of the UCC warranty claims, not on limitations grounds, but on the ground that, based on the facts alleged in the complaint, the plaintiffs' claims are simply not cognizable under the UCC.[12]

---

12. We disagree with the description by the Court of Special Appeals of fraudulent concealment under Code (1974, 1989 Repl.Vol.), § 5–203 of the Courts and Judicial Proceedings Article. We have previously held that "where the underlying cause of action is deceit, § 5–203 does not require a fraud distinct from, and independent of, the original fraud for the purpose of keeping the injured party in ignorance of the cause of action." *Geisz v. Greater Baltimore Medical*, 313 Md. 301, 325, 545 A.2d 658 (1988). Also, the fraud may be "an express, knowingly false misrepresentation." *Id.*

Clearly, the complaint does not allege that defendants Hoover Wood and Hoover Universal knew their statements were false at the time they sold the plywood that eventually comprised the roofs belonging to Herlihy and Karbeling. Nevertheless, the Court of Special Appeals implied that plaintiffs could establish fraudulent concealment simply by showing (1) that the plaintiffs were diligent in their efforts to pursue their causes of action and (2) that the defendants controlled all information concerning the plywood defects and *did not disclose* it to the

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART. ALL COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONERS/CROSS-RESPONDENTS.*

ELDRIDGE, Judge, dissenting:

I disagree with the majority's decision to affirm the dismissal of the plaintiffs' tort claims and Consumer Protection Act claims.

## I.

In my view, the only way the Court could determine that the economic loss rule bars tort recovery in this case is to draw doubtful inferences favoring the defendants. The plaintiffs' allegations were sufficient to withstand a motion to dismiss.

In considering whether the complaint was properly dismissed for failure to state a claim, we should be guided by the following principle (*Decoster v. Westinghouse,* 333 Md. 245, 249, 634 A.2d 1330, 1332 (1994)):

> "In determining whether the trial court erred in granting the motion to dismiss for failure to state a claim pursuant to Md.Rule 2–322(b), we must assume the truth of all well-pleaded relevant and material facts as well as all inferences that reasonably can be drawn therefrom. Dismissal is proper only if the facts alleged fail to state a cause of action. *Faya v. Almaraz,* 329 Md. 435, 443, 620 A.2d 327 (1993); *Sharrow v. State Farm Mutual,* 306 Md. 754, 768, 511 A.2d 492 (1968) [(1986)]."

Moreover, not only must we assume the truth of all well-pleaded facts and inferences, but we must view them in the light most favorable to the plaintiff. As Chief Judge Murphy

---

plaintiffs. Non-disclosure, however, has never been sufficient to establish fraud, in any context, absent some duty to disclose.

recently stated for the Court in *Board of Education v. Browning*, 333 Md. 281, 286, 635 A.2d 373, 376 (1994),

> "Dismissal is only proper if the facts and allegations viewed in the light most favorable to the plaintiff fail to afford the plaintiff relief if proven."

*See, e.g., Berman v. Karvounis*, 308 Md. 259, 264, 518 A.2d 726, 728 (1987) ("Since we are dealing with a motion to dismiss, we consider appellants' well-pleaded allegations in the light most favorable to them"). *See also Stone v. Chicago Title Ins.*, 330 Md. 329, 333–334, 624 A.2d 496, 498 (1993), and cases cited therein.

In Maryland, a plaintiff may recover in tort for an economic injury resulting from a defective product if there is a substantial and unreasonable risk of death or personal injury. *U.S. Gypsum v. Baltimore*, 336 Md. 145, 647 A.2d 405 (1994); *Council of Co–Owners v. Whiting–Turner*, 308 Md. 18, 517 A.2d 336 (1986). Here, the plaintiffs have alleged in their complaint that there is an immediate threat of personal injury if weight is applied to their roofs which are constructed with FRT plywood. The plaintiffs have further alleged that this weight could be in the form of snow on the roofs or persons on the roofs.

Instead of accepting these assertions on their face and drawing reasonable inferences from the assertions favorable to the plaintiffs, which is the correct approach in reviewing the dismissal of a complaint for failure to state a claim, the majority holds that the plaintiffs have not met the required legal threshold of pleading. In so doing, the majority draws inferences in the light most favorable to the defendants and departs from our prior cases.

In analyzing the complaint, the majority first notes that the plaintiffs failed to allege that any personal injuries have occurred since the roofs were installed.[1] The majority then

---

1. Although this is technically correct, the majority points out in footnote 3 of its opinion that, in an earlier version of the complaint, the plaintiffs had alleged that homeowners and others had fallen through the roofs.

reasons that because no actual injuries were alleged, the plaintiffs have pled "mere 'possibilities' of injury" and thus have failed to sufficiently allege a cause of action. It is true that conditions which "fall short of presenting a clear danger of death or personal injury will not suffice to permit a tort recovery for economic loss." *Council of Co–Owners v. Whiting–Turner, supra,* 308 Md. at 35 n. 5, 517 A.2d at 345 n. 5. The majority, however, appears to be saying that in order to plead a legally sufficient economic loss cause of action in tort, the plaintiffs or others must first be injured. This clearly is not the law.

The majority's reasoning contradicts the holdings in our previous cases and the rationale that prompted this Court to recognize a cause of action in tort for economic loss absent an actual injury. The very holding of *Council of Co–Owners v. Whiting–Turner, supra,* 308 Md. at 22, 517 A.2d at 338, is as follows: "we hold that where a dangerous condition is discovered *before it results in injury,* an action in negligence will lie for the recovery of the reasonable cost of correcting the condition." (Emphasis added). The rationale underlying Maryland's exception to the economic loss rule is that one should not " 'have to wait for a personal tragedy to occur in order to recover damages to remedy or repair defects.' " *Council of Co–Owners v. Whiting–Turner, supra,* 308 Md. at 35, 517 A.2d at 345. In neither *Whiting–Turner* nor *U.S. Gypsum v. Baltimore, supra,* had an actual injury occurred because of the defective condition. Accordingly, in reviewing a motion to dismiss, any analysis that draws negative inferences from the absence of an injury is entirely inappropriate.

It is common knowledge that homeowners or their agents often need to walk on their roofs to clear debris, to clean gutters, to clean downspouts, to replace shingles, to fix flashing, to clean chimneys, to mount television antennas, etc. In light of this, it is entirely reasonable to infer that there is a substantial risk of serious personal injury because of the defective roofs. Instead, the majority presumes that because no such injury has yet occurred, no injury will likely occur in the future. The message the majority sends to these home-

owners is that they should attempt to clean their downspouts, replace shingles, etc., and sue for economic loss only after the roofs give way and they fall, breaking their legs or their necks.

The majority also states "that it is the *serious* nature of the risk that compels recognition of a cause of action in tort for economic loss, absent actual injury." The majority then concludes that the risk of harm alleged here is not sufficiently serious, again drawing a doubtful inference most favorable to the defendants. The more appropriate inference here is that a serious injury or even death is a foreseeable result of weight being applied to a defective and deteriorating roof.

In evaluating whether the plaintiffs have alleged a sufficiently serious risk of injury, I find the two hypothetical situations discussed in the *Whiting–Turner* opinion to be instructive. In *Whiting–Turner*, the opinion at one point discussed two hypothetical situations, one of which was deemed to state a cognizable cause of action in tort for economic loss and one which was not. The Court in *Whiting–Turner, supra,* 308 Md. at 34–35, 517 A.2d at 345, quoting with approval from the opinion of the Supreme Court of Indiana in *Barnes v. Mac Brown and Company, Inc.,* 264 Ind. 227, 230, 342 N.E.2d 619, 621 (1976), first stated:

> " 'If there is a defect in a stairway and the purchaser repairs the defect and suffers an economic loss, should he fail to recover because he did not wait until he or some member of his family fell down the stairs and broke his neck? Does the law penalize those who are alert and prevent injury? Should it not put those who prevent personal injury on the same level as those who fail to anticipate it?' "

We went on in *Whiting–Turner* to answer the above questions in the affirmative, upholding the right to recover for economic loss where there is a risk of death or personal injury, but we did note a situation where there should be no recovery. The Court explained (*ibid.*):

"We conclude that the determination of whether a duty will be imposed in this type of case should depend upon the risk generated by the negligent conduct, rather than upon the fortuitous circumstance of the nature of the resultant damage. Where the risk is of death or personal injury[5] the action will lie for recovery of the reasonable cost of correcting the dangerous condition."

[5.] "It is the serious nature of the risk that persuades us to recognize the cause of action in the absence of actual injury. Accordingly, conditions that present a risk to general health, welfare, or comfort but fall short of presenting a clear danger of death or personal injury will not suffice. A claim that defective design or construction has produced a drafty condition that may lead to a cold or pneumonia would not be sufficient."

The allegation that defective and deteriorating roofs will lead to serious personal injury if persons get on them or if weight is applied, if proven, is more analogous to the defective stairway than a draft-related cold. The danger that someone will be injured when a roof is constructed with defective materials is more of a probability than a possibility. To conclude otherwise requires a weighing of the parties' claims, *i.e.*, fact-finding. In reviewing the sufficiency of the plaintiffs' allegations, it is not the proper role of a court to determine the truth of those allegations. In my view, the plaintiffs have alleged enough. Further exploration concerning the extent of the risk presented by the defective roofs should await trial.

The majority also appears to alter the test for establishing a cause of action in tort for economic loss based on a defective product. The majority states that the plaintiff must plead "the existence of a clear and extreme danger of death or *serious* personal injury...." As the previously quoted passage from the *Whiting–Turner* opinion discloses, the Court in *Whiting–Turner* simply required that there be a risk of death or serious personal injury as opposed to "a risk to general health, welfare, or comfort." 308 Md. at 35 n. 5, 517 A.2d at 345 n. 5. The *U.S. Gypsum* opinion worded the test as follows (336 Md. at 156–157, 647 A.2d at 410): "a plaintiff may still recover in tort [for economic loss] if the defect creates a substantial and unreasonable risk of death or personal injury."

The majority today, in addition to requiring that there be a substantial risk of serious injury, requires that there be "a clear and extreme danger" of death or serious personal injury. The basic principle reflected in the *Whiting–Turner* and *U.S. Gypsum* cases is that a person saddled with a defective product need not wait until someone is killed or injured before bringing a tort action to recover the cost of correcting the dangerous condition. The test enunciated and applied by the majority may largely undermine this principle. If the cause of action is limited to those who can show that the risk or danger of serious personal injury is "extreme," and if a defective and deteriorating roof that is unable to withstand weight does not present an "extreme" risk, the cause of action recognized in our prior cases may be illusory.

I would reverse the dismissal of the tort claims and permit the trier of facts to determine whether there is a sufficient risk of serious injury from the roofs constructed with FRT plywood.

## II.

I believe that the plaintiffs' allegations were also sufficient to set forth claims under the Consumer Protection Act, Maryland Code (1975, 1990 Repl.Vol.), § 13–101, *et seq.*, of the Commercial Law Article.

The majority affirms the dismissal of the Consumer Protection Act claims on the ground that the defendants' alleged misrepresentations about their brand of plywood roofing material were made to the builders and not directly to the plaintiffs. The majority suggests that if the defendant manufacturers had, by advertising, directly attempted to influence the plaintiffs to purchase homes containing the defendants' brand of plywood, the plaintiffs would have stated a cause of action under the Consumer Protection Act. Nevertheless, because the defendants' advertising was "targeted to builders that their products were suitable for roofing," the majority concludes that the effect on the sale of consumer realty is

"remote" and that, therefore, the plaintiffs' allegations are insufficient. I disagree.

The distinction drawn by the majority between a manufacturer's advertising aimed directly at the ultimate consumers and a manufacturer's advertising aimed at intermediate sellers such as builders or building supply stores, is largely a distinction without a difference. In either situation, the representations in the manufacturer's advertising are intended to have the same effect, namely the purchase of the product or purchase of homes incorporating the product by the ultimate consumers. The intermediate seller will obviously re-sell or recommend to the consumer the product which the intermediate seller has been induced to buy because of the manufacturer's representations. Often the manufacturer's representations will be repeated by the intermediate seller, or the intermediate seller will show the manufacturer's advertising to the consumer. Whether a manufacturer's advertising is directly aimed at the ultimate consumers or indirectly aimed at them through intermediaries, the purpose is to induce the use of the product by the ultimate consumers.

The reality of the business and advertising world necessitates protecting consumers in both situations. Nothing in the language of the Consumer Protection Act requires the distinction drawn by the majority. On the contrary, the General Assembly foresaw the need to protect consumers who are injured indirectly by the unfair trade practices of remote merchants. The Consumer Protection Act, by its very language, contemplates this indirect involvement by defining a merchant as "a person who directly or *indirectly* either offers or makes available to consumers any consumer goods, consumer services, consumer realty, or consumer credit." § 13–101(g) of the Commercial Law Article, emphasis added.

The majority is correct in characterizing this issue as a "question of statutory construction, the goal of which is to determine the General Assembly's intent in enacting the legislation." To guide our statutory construction, the General Assembly has mandated that the Consumer Protection Act

must "be construed and applied liberally to promote its purpose," § 13–105 of the Commercial Law Article. Rather than construe the Act liberally in order to protect consumers, the majority ignores the definition of "merchants" that would hold the defendants liable for their actions.

When a consumer is induced to purchase a defective product by the manufacturer's misrepresentations, it matters little whether the misrepresentations were made directly to the consumer or passed through an intermediary. In either situation, the purpose of the Consumer Protection Act is implicated. As one court observed in holding that a consumer protection statute covered a misrepresentation made by a seller to an intermediary who in turn sold the product to the consumer, "to hold otherwise would create a loophole which would effectively undermine the Act." *State of Utah v. B & H Auto*, 701 F.Supp. 201, 205 (D.Utah 1988). *See also, e.g., State v. Cottman Transmissions*, 86 Md.App. 714, 724 n. 9, 587 A.2d 1190, 1195 n. 9, *cert. denied*, 324 Md. 121, 596 A.2d 627 (1991) ("Cottman was found to be a 'merchant.' In order to accept Cottman's theory, we would have to hold that a merchant company may insulate itself from the consequences of its deceptive practices by conducting them through intermediaries. We reject that theory"); *Kociemba v. G.D. Searle & Co.*, 680 F.Supp. 1293, 1305 (D.Minn.1988) (consumer protection statute permits a consumer to sue an IUD manufacturer based on advertisements to doctors because statute covers direct as well as indirect advertisements); *Pack & Process, Inc. v. Celotex Corp.*, 503 A.2d 646, 658 (Del.Super.Ct.1985) (a roof manufacturer's representation to an intermediate buyer may be the basis of a consumer action by the eventual consumer); *Jones v. Sportelli*, 166 N.J.Super. 383, 390, 399 A.2d 1047, 1050 (1979) ("The provision of an IUD to a gynecologist essentially constitutes, at the very least, an indirect attempt to sell the IUD to a wanting patient with the concomitant expectation of monetary return").

I believe that by including the language "directly or indirectly" in the definition of merchant, the General Assembly of Maryland intended to protect consumers from sellers of prod-

ucts who insulate themselves from the consequences of their misrepresentations or deceptive practices by utilizing intermediaries.[2]

Judges BELL and RAKER have authorized me to state that they concur with the views expressed herein.

---

**2.** Such a construction does not, as the majority fears, provide a cause of action to a consumer who sues "for misrepresentations made by any manufacturer of a component part to another manufacturer, so long as the component part was eventually included in the product purchased by the consumer." Majority's slip opinion at 21. My analysis here concerns the deceptions of a manufacturer of a final product, not a remote manufacturer of a component part. To presume that my position opens a "Pandora's box" of litigation by consumers against manufacturers of component parts is not accurate. The question of whether the statute encompasses suits by consumers against manufacturers of component parts is not before us in this case. I express no opinion on the matter. I do note, however, that under the majority's own standard, a consumer could sue a manufacturer of a component part so long as that manufacturer advertises directly to the consumer.