REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 0766

September Term, 2013

_____

FRANK LAROCCA, ET AL.

v.

THE CREIG NORTHROP TEAM, P.C., ET
AL.

_____

Zarnoch,
Hotten,
Leahy,

JJ.[1]

_____

Opinion by Hotten, J.

_____

Filed: June 25, 2014

[1] Judges Timothy E. Meredith, Christopher B. Kehoe, and Kevin F. Arthur did not participate in the Court's decision to designate this opinion for publication in the Maryland Appellate Reports pursuant to Maryland Rule 8-605.1

Appellants, three married couples, obtained financing to purchase new homes through appellees, several realtors, mortgage agencies, banks and their employees. Appellants filed a class action lawsuit in the Circuit Court for Howard County, asserting a number of claims related to an alleged mortgage fraud scheme. The circuit court granted summary judgment as to all counts in appellants' original complaint on statute of limitations grounds. It also denied class certification on grounds of insufficient numbers, and granted a motion to strike appellants' second amended complaint because of prejudice to appellees. Appellants appealed, presenting the following questions for our consideration:

1. Did the [c]ircuit [c]ourt err in ruling that claims concerning mortgage fraud and forged leases were time-barred because inquiry notice was triggered by inconspicuous reference to "gross rental income" surreptitiously inserted on one page out of hundreds initialed and signed by [a]ppellants?

2. Did the [c]ircuit [c]ourt err in ruling that advertising a fake loan program that secretly involved forged leases and other acts of deception did not violate the SMLL because the false and misleading information putatively concerned underwriting guidelines, not loan terms?

3. Did the [c]ircuit [c]ourt err in ruling that, for SMLL claims based on advertising the fake loan program that purported to be a package of secondary and primary mortgages, borrowers could only collect treble damages based on the interest and charges collected under the secondary mortgage, but not the primary mortgage?

4. Did the [c]ircuit [c]ourt err in ruling that the individual loan officers who made the secondary mortgages were not "lenders" despite that the statutory definition of lenders includes individuals who make loans?

5. Did the [c]ircuit [c]ourt err in denying class certification based solely on concluding that the proposed class was not numerous enough because of counting transactions, not persons, and estimates of class size were only approximations that did not take into account the collapse of the housing market and other variables?

6.      Did the [c]ircuit [c]ourt err in ruling that the filing of the [s]econd [a]mended [c]omplaint was unfairly prejudicial, despite that it was filed more than 30 days before trial, in accordance with the [c]ircuit [c]ourt's [s]cheduling [o]rder, and the new claims would be barred by *res judicata* if not brought in this action?

7.      Did the [c]ircuit [c]ourt err in ruling that compensation paid to Carla Northrop by Lakeview Title Company, Inc. ("Lakeview") was not relevant to claims concerning real estate transactions brokered by Ms. Northrop's broker and settled at Lakeview?

For the reasons that follow, we shall affirm in part and reverse in part the judgment of the circuit court.

## FACTUAL AND PROCEDURAL HISTORY

**The Parties**

This case involves six appellants and eleven appellees. Appellants consist of three married couples: Frank and Catherine LaRocca, Kenneth and Angela Pfeifer, and Mehdi Nafisi and Forough Iranpour. All are residents of Maryland who owned a primary residence and contacted appellees regarding purchasing a new primary residence. Since there are eleven appellees, they have been divided into three groups. The "Realtor Appellees" are the Creig Northrop Team, P.C., ("the Northrop Team"); Crieghton Northrop ("Mr. Northrop"); Carla Northrop ("Ms. Northrop"); and Long & Foster Real Estate, Inc. (Long & Foster"). The "Banking Appellees" are Wells Fargo Bank, N.A. ("Wells Fargo"); Prosperity Mortgage ("Prosperity"), PNC Mortgage, a division of PNC Bank ("PNC"), formerly National City Mortgage; Michelle Mathews ("Ms. Matthews"), a loan officer for Prosperity who worked in the Northrop Team's offices; and Suzanne Scales Windesheim ("Ms. Windesheim"), a

loan officer for PNC. The Title Appellees are Lakeview Title ("Lakeview"), a licensee of Long & Foster, and Lindell Eagan, an employee of Long & Foster.

**Factual Background**

While the dates differ, appellants generally shared the same experience in obtaining financing and purchasing their new homes through the Northrop Team. During 2006 and 2007, appellants contacted the Northrop Team regarding purchasing new homes. Through discussions with Ms. Matthews, appellants were led to believe that the Northrop Team would make available to them a "Bridge Loan Program." Under the Bridge Loan Program, appellants would obtain financing using the equity in their old homes, while at the same time receiving a primary purchase money mortgage for their new home, that was non-contingent upon the sale of the old home. Unbeknownst to appellants, the purported Bridge Loan Program did not exist and likely violated the underwriting policies of the lenders. Appellants allege that the Realtor Appellees concealed the lack of a Bridge Loan Program by using forgeries and other misrepresentations to obtain fraudulent financing. Appellants each entered into a non-contingency contract to purchase a new home and obtained a home equity line of credit ("HELOC") through PNC. At each appellants' closing for the HELOC, they reviewed and signed a number of documents, including a Uniform Residential Loan Application, referred to as Form 1003. The Laroccas and the Pfeifers closed on their HELOCs in 2006 and the Nafisis/Iranpours closed on theirs in 2007. The parties understood that under the loan program, they would be paying for three mortgages until the old homes

were sold. They completed the mortgage process, sold their old homes, and paid off the HELOCs in July 2006, for the Laroccas, June 2007, for the Pfeifers, and September 2007 for the Nafisis/Iranpours. In mid-2010 and mid-2011, appellants were individually contacted by counsel, informing them that another case[1] had revealed a possible fraudulent mortgage scheme. Appellants allege that they were unaware that the Bridge Loan Program was not legitimate.

Appellants filed the instant case as a class action lawsuit in December 2011, with appellants as the named plaintiffs and proposed class representatives. In their complaint, they asserted that in order to effectuate the Bridge Loan Program, appellees acted to conceal from others that appellants still owned their old homes. Appellants claim that appellees made misrepresentations regarding appellants' income and the status of the old homes so that appellants could qualify for loans they were unqualified for. As a result of appellees' fraudulent actions, their old homes were on the market for a considerably longer period of time than they normally would have been, which resulted in appellants paying three mortgages for a longer period of time and incurring more fees. Appellants also contend that the Realtor Appellees pressured them into selling their old homes below market value.

---

[1] The other case, *Ripkin v. Long & Foster Real Estate, Inc. et al.*, No. 13-08-73725, was between the Ripkin plaintiffs and the Realtor and Banking Appellees. During discovery in that case, counsel was alerted to potential mortgage fraud by forged leases. The Realtor Appellees also provided a list of 21 other loan customers who may have participated in the same fraudulent loan program. Following the conclusion of this case, counsel contacted appellants about pursuing legal action.

**Procedural Background**

Appellants' class action complaint included eleven counts against the Realtor and Banking Appellees. Appellees moved to dismiss the complaint, asserting statute of limitations as a defense. The court denied the motion, ordering discovery to continue so that it could be determined whether limitations barred the action. During discovery, appellants issued a subpoena requesting compensation documents from Lakeview. Since Lakeview was not a party to the action at that time, the Realtor Appellees moved for a protective order. The court granted the order after reviewing the documents *in camera* and reasoning that they were not related to any of the counts alleged in appellants' complaint. Following discovery, appellees moved for summary judgment on all counts, again arguing the statute of limitations defense. Before the court ruled on the motion for summary judgment, appellants filed a second amended complaint, adding a new count and three new appellees, the Title Appellees and Ms. Northrop. Following a hearing on the motion for summary judgment, the court granted the motion, finding that as a matter of law, the statute of limitations began accruing at the parties' respective HELOC closings in 2006 and 2007 and therefore, the limitations period had run by the time the complaint was filed in December 2011. The court also denied appellants' motion for class certification and granted appellees' motion to strike the second amended complaint. Appellants noted a timely appeal against all appellees.

Additional facts shall be provided, *infra*, to the extent they prove relevant in addressing the issues presented.

## STANDARD OF REVIEW

Summary judgment is proper where the circuit court determines that there are no genuine disputes as to any material fact and that the moving party is entitled to judgment as matter of law. *See* Md. Rule 2-501. Disputes concerning contract interpretation are questions of law and frequently regarded as appropriate for summary judgment. *See Sandler v. Executive Mgmt. Plus*, 203 Md. App. 399, 423 (2012) (noting that contract interpretation is a question of law). *See also Bank of Montreal v. Signet Bank*, 193 F.3d 818, 835 (4th Cir. 1999).

We review a circuit court's grant of summary judgment *de novo*. *Mitchell v. Baltimore Sun Co.*, 164 Md. App. 497, 506 (2005). In reviewing the grant of a motion for summary judgment, appellate courts focus on whether the circuit court was legally correct. *Laing v. Volkswagen of Am., Inc.*, 180 Md. App. 136, 152-53 (2008) (citations omitted). "The parameter for appellate review is determining 'whether a fair minded jury could find for the plaintiff in light of the pleadings and the evidence presented, and there must be more than a scintilla of evidence in order to proceed to trial . . . .'" *Id.* at 153. "Additionally, if the facts are susceptible to more than one inference, the court must view the inferences in the light most favorable to the non-moving party." *Id.*

We review rulings on motions for protective orders, motions to strike, and motions for class certification all under an abuse of discretion standard. *See Creveling v. Gov't Employees Ins. Co.*, 376 Md. 72, 90 (2003) ("We ordinarily review a [circuit court's]

decision regarding whether to certify a class action for an abuse of discretion."); *Tanis v. Croker*, 110 Md. App. 559, 573 (1996) (stating that this Court reviews the grant of a protective order under an abuse of discretion standard); *Hendrix v. Burns*, 205 Md. App. 1, 45 (2012) ("We review for abuse of discretion a court's decision to allow or disallow amendments to pleadings or to grant or deny leave to amend pleadings."). "A trial judge abuses his or her discretion where no reasonable person would take the view adopted by the [trial] court." *Maryland-Nat'l Capital Park & Planning Comm'n v. Mardirossian*, 184 Md. App. 207, 217 (2009) (citing *Fontaine v. State*, 134 Md. App. 275, 288 (2000)).

Our standard of review for determining whether a [c]ircuit [c]ourt used a correct legal standard in determining whether to grant or deny class certification is *de novo*. *Philip Morris, Inc. v. Angeletti*, 358 Md. 689, 726 (2000).

## DISCUSSION

**1. Did the circuit court improperly grant summary judgment as to counts I to IX and XI because there were genuine disputes of material fact?**

At the conclusion of discovery, the Realtor appellees moved for summary judgment, again asserting limitations as a defense.[2] Specifically, they argued that the question of accrual of statute of limitations was a matter of law, that limitations had run a year before the lawsuit was filed, and that the discovery rule did not excuse the untimeliness. Appellees claimed that appellants were on inquiry notice of fraud at the latest in 2006, for the Larocca

---

[2] The Banking Appellees filed joinders of Realtor appellees motion for summary judgment. The Title Appellees were not yet a party to the action at the time of the filing.

and Pfeifer appellants, and in 2007, for the Nafisi/Iranpour appellants, because of the mention of false "gross rental income" in Form 1003 which was signed at the HELOC closings. Appellants responded that any notice that may have occurred at the HELOC closings were irrelevant because their claim was that the Bridge Loan Program did not exist and was fraudulently marketed. They asserted that, in order to ensure that appellants would qualify for the two new mortgages, appellees misrepresented appellants' respective incomes, performed fraudulent acts that enabled them to conceal that appellants still owned their old homes and, in turn, the Realtor Appellees secured sales commissions by submitting non-contingent offers. Accordingly, as a result of the fraud, any notice in 2006 regarding Form 1003 was not sufficient to place appellants on notice that the Bridge Loan Program was not a legitimate loan. Therefore, pursuant to the discovery rule, their claims were timely because they did not discover the Bridge Loan Program was fraudulent until 2010. The circuit court held a hearing on the motion which lasted longer than five hours. In its memorandum opinion, the court granted summary judgment as to counts I through IX and XI. The court found that appellants had failed to establish any dispute of the fact that they had reviewed and signed Form 1003. Then, applying the "signature doctrine", which presumes that one who signs a document is bound to its terms, the court found that appellants were on notice at the HELOC closings in 2006 and 2007 and consequently counts I through IX and XI were untimely.

On appeal, appellants advance similar arguments, namely that the factual disputes

regarding timeliness were a question for a jury; that the circuit court improperly applied the signature doctrine; and that one reference to "gross rental income" in hundreds of documents did not constitute notice. Appellees maintain that there is no dispute that appellants received Form 1003 and that the Form placed them on notice of any alleged fraudulent activity.

Maryland Code, (2006 Repl. Vol. 2012), Courts and Judicial Proceedings §5-101 [hereinafter Cts. & Jud. Proc.] provides:

> A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced.

Generally, the statute of limitations begins to accrue when a plaintiff knows of the wrong he or she sustained. *See Kumar v. Dhanda*, 198 Md. App. 337, 343 (2011) (explaining that for example, in a breach of contract case the date of accrual is the date of the breach). Modernly, the discovery rule provides that "the cause of action accrues when the claimant in fact knew or reasonably should have known of the wrong." *Poffenberger v. Risser*, 290 Md. 631, 636 (1981). This Court and the Court of Appeals have acknowledged that the discovery rule, while originally adopted as an exception, is now the general rule. *See Lumsden v. Design Tech Builders, Inc.*, 358 Md. 435, 444 (2000).

> Having already broken the barrier confining the discovery principle to professional malpractice, and sensing no valid reason why that rule's sweep should not be applied to prevent an injustice in other types of cases, we now hold the discovery rule to be applicable generally in all actions and the cause of action accrues when the claimant in fact knew or reasonably should have known of the wrong.

*Id.* (quoting *Poffenberger*, 290 Md. at 636).

In *Poffenberger*, a homeowner brought suit against his homebuilder for failing to comply with applicable building restrictions. 290 Md. at 633. The home had been built in 1972 and the homeowner filed suit after he discovered the building violation in 1976. *Id.* The homebuilder moved for summary judgment relying on Cts. & Jud. Proc. §5-101, asserting that the homeowner's suit was barred by the three year statute of limitations. *Id.* The homebuilder argued that the action began accruing when the home was completed in 1972 while the homeowner argued that the action did not begin accruing until he discovered the violation in 1976. *Id.* at 634. The circuit court granted summary judgment and the homeowner appealed. The Court of Appeals began its analysis by announcing that the discovery rule was applicable to all actions and accordingly, could be applied in the case. *Id.* at 636. The homebuilder argued that the homeowner had constructive notice in 1972 because the plat and deed showed the land boundaries. *Id.* at 637. The Court of Appeals rejected this argument, holding that in order for there to be notice sufficient to begin tolling of the statute of limitations, a plaintiff required actual notice. *Id.* It explained that there are two forms of actual notice, express and implied:

> Express notice embraces not only knowledge, but also that which is communicated by direct information, either written or oral, from those who are cognizant of the fact communicated. Implied notice, which is equally actual notice, arises where the party to be charged is shown to have had knowledge of such facts and circumstances as would lead him, by the exercise of due diligence, to a knowledge of the principal fact . . . . It is simply circumstantial evidence from which notice may be inferred.

*Id.* The Court concluded that there was no dispute that the homeowner lacked express notice,

but there was clearly a dispute as to whether he had implied notice. *Id.* at 638. It remanded back to the circuit court so that the factual dispute could be addressed at trial. *Id.*

While a grant of summary judgment is appropriate where the statute of limitations has expired, the Court of Appeals has explained that the question of accrual under Cts. & Jud. Proc. §5-101 may be a question for a jury. *Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 95 (2000). The Court stated that: "[t]his determination may be based solely on law, solely on fact, or on a combination of law and fact, and is reached after careful consideration of the purpose of the statute and the facts to which it is applied." *Id.*

Appellants rely on *Dashiell v. Meeks*, 396 Md. 149 (2006) in support of their argument that the circuit court erred in finding that their claims were barred as a matter of law. There, Meeks hired Dashiell as his attorney in 1989 to draft a prenuptial agreement in anticipation of his upcoming wedding. *Id.* at 157. According to Meeks, the draft of the agreement he reviewed with Dashiell contained an alimony waiver provision. *Id.* However, unbeknownst to Meeks, the final version which he and his fiancé signed did not include the waiver. *Id.* At trial, Meeks claimed that he was unaware any changes had been made between the first draft and the final draft, and that Dashiell had indicated that he did not need to read the final draft because no changes had been made. *Id.* at 159. In 2001, Meeks and his wife separated and it was at this point Meeks discovered the signed agreement lacked the alimony waiver. *Id.* Meeks filed a legal malpractice action against Dashiell claiming he was negligent in failing to include the waiver and in advising Meeks that he did not need to read

the contract prior to signing. *Id.* Dashiell moved for summary judgment, arguing in part that the claim was barred under the three year statute of limitations. The court granted the motion based on limitations and Meeks appealed to this Court. *Id.* We vacated the circuit court's ruling, concluding that the claim was not barred by the statute of limitations. *Id*. at 158 (citing *Meeks v. Dashiell*, 166 Md. App. 415 (2006)(en banc)).

Dashiell appealed and the Court of Appeals granted *certiorari*. The Court began its analysis by acknowledging the general rule "under Maryland contract law that, as between the parties to an agreement, a party who signs a contract is presumed to have read and understood its terms and that the party will be bound by them when that document is executed." *Id.* at 167. The Court explained that absent fraud, duress or mutual mistake, the Court will not rescind an agreement because one party, due to their own carelessness in reading the terms, does not want to abide by the agreement. *Id.* The Court then held that the trial court erred when it found that Meeks was "charged with knowledge . . . at the time he signed the document." *Id.* at 168. Applying the discovery rule, the Court concluded that there was a question of fact regarding whether Meeks was on notice. It held that "the discovery rule tolls the running of the statute of limitations and it is ordinarily a question for the jury or the ultimate factfinder as to whether the plaintiff failed to discover the cause of action because he failed to exercise due diligence or whether he was unable to discover it (and, as a result, unable to exercise due diligence) because the defendant concealed the wrong." *Id.* at 169.

This Court and the Court of Appeals have reached the same conclusion in other cases. *See Frederick Road*, 360 Md. 76 (2000) and *Supik v. Bodie et al.*, 152 Md. App. 698 (2003). In *Frederick Road*, an elderly couple, the Kings, hoping to minimize estate and gift taxes, contacted their attorney, Brown, regarding transferring their farm land to their children before they died. 360 Md. at 81. The Kings' other attorney, Wolf, believed that the land was valued somewhere between $20 million and $100 million. *Id.* Brown believed that if the Kings appraised the farm as "farm use only", valuing it between $515,000 and $720,000, they would incur significant tax savings. *Id.* Wolf strongly disagreed with Brown's advice and expressed his objections to the Kings. *Id.* at 82. Eventually, in 1981, the Kings proceeded with Brown's plan, sold their farm to their children for approximately $600,000 and discharged Wolf as their attorney. *Id.* In response, Wolf sent the Kings a letter expressing his concerns regarding Brown's valuation plan and that they could be subject to serious tax consequences. The Kings died and Brown continued to represent the King children on matters relating to the farm. *Id.* at 84. Five years after the transfer, the IRS began investigating the land transfer and issued a deficiency assessment of more than $68 million in penalties and taxes. *Id.* The IRS contended the sale of the land had been undervalued and as a result, not enough taxes had been paid. *Id.* Brown convinced the King children that Wolf had sent the IRS his letter to their parents expressing his concerns about the sale amount, and as a result, they had no defenses and should settle with the IRS for $20 million. *Id.* at 85. The King children agreed and in 1988 settled with the IRS. In 1991, they

filed a malpractice suit against Wolf. *Id.* at 87. The circuit court granted Wolf summary judgment reasoning that if the King children had sustained any damages, it was the result of Brown's poor legal advice in the 1981 sale and Brown's failure to contest the admissibility of Wolf's letter in tax court. *Id.* In 1995, seven years after the IRS settlement, the King children filed a malpractice action against Brown. *Id.* at 88. The circuit court granted Brown summary judgment after finding that the King children's claims were barred by statute of limitations and/or laches. *Id.* at 89. The King children appealed and we affirmed the circuit court's judgment. *Id. See also Frederick Road v. Brown & Sturm*, et al., 121 Md. App. 384 (1998).

Before the Court of Appeals, the King children argued that Brown had deliberately prevented them from discovering his wrongdoing and that therefore, the court erred in finding their claims were barred. *Id.* at 91. Brown contended that there were distinct acts in 1982, 1985, 1987, and 1988 that placed the King children on inquiry notice of a potential cause of action. *Id.* at 92. The Court of Appeals reviewed the underlying principles of the discovery rule. *Id.* at 95-96. It explained that "the question of notice generally requires the balancing of factual issues and the assessment of the credibility or believability of the evidence." *Id.* at 96. (quoting *O'Hara v. Kovens*, 305 Md. 280, 294-95 (1986)). The Court also explained that there were some circumstances that would toll the statute of limitations, including fraud, pursuant to Cts. & Jud. Proc. §5-203.[3] *Id.* at 98. Again, quoting *O'Hara*,

---

[3] "If the knowledge of a cause of action is kept from a party by the fraud of an adverse (continued...)

- 14 -

the Court explained that for fraud:

> [B]eing 'on notice' means having knowledge of circumstances which would cause a reasonable person in the position of the plaintiffs to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged fraud.

*Id.* at 99 (quoting *O'Hara*, 305 Md. at 302). The Court held that because of the relationship between the parties, a jury could have found that the King children were not on notice of a potential claim against Brown.

In *Supik*, 152 Md. App. at 704, the plaintiffs were represented by the defendant in a toxic tort litigation against two exterminators who had treated the plaintiffs' home. Over the course of the three years the defendant represented them, the parties would occasionally disagree regarding a course of action or, in more extreme instances, the defendant would act contrary to the plaintiffs' wishes. *Id.* at 705-08. Eventually, they settled the toxic tort case but subsequently, the plaintiffs learned that the settlement was for an amount significantly less than it likely was worth. *Id.* at 708. As a result, the plaintiffs filed a legal malpractice action against the defendant. *Id.* In response, the defendant moved for summary judgment using the statute of limitations as its defense. The circuit court granted summary judgment, finding that the plaintiffs were on inquiry notice of malpractice before the settlement occurred. *Id.* at 709. The plaintiffs appealed.

---

(...continued)
party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud." Cts. & Jud. Proc. §5-203.

- 15 -

On appeal, citing *Frederick Road*, we observed that "Maryland's appellate courts have repeatedly stated that the determination of when a cause of action "accrues" under §5-101 of the Courts and Judicial Proceedings Article is one left to the court for judicial determination." *Supik* at 710. We then explained that "[w]e read *O'Hara* and *Frederick Road* directing that **only** when there is no genuine dispute of material fact as to when the action accrued, should a trial court grant summary judgment on the basis of limitations; otherwise, the question is one of fact for the trier of fact." *Id.* at 710-11 (emphasis in original). We also noted that when credibility of witnesses or weight of evidence is at issue, the question is one for the jury to resolve. *Id.* Next, we reviewed some of the instances when the statute of limitations may be tolled, including fraud. "The fraud exception is essentially a tangent of the discovery rule. If an adverse party fraudulently conceals knowledge of a cause of action, 'the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud.'" *Id.* at 715 (quoting [Cts. & Jud. Proc.] §5-203). We considered that there was some dispute between the parties over whether any of the prior disagreements or the defendant's acts against the will of the plaintiffs constituted notice. The defendant claimed that they should have been on inquiry notice of a potential malpractice action before the settlement and at latest when the settlement occurred. The plaintiffs argued that they did not have notice until well after the settlement, thereby tolling the statute of limitations. *Id.* at 720. We held:

> Because the ordinary principles governing summary judgment continue to
> apply when the issue is summary judgment on grounds of limitations, and

> because there does exist, in this case, a genuine dispute of material fact, we
> hold that the trial court erred as a matter of law in granting [the defendant's]
> motion for summary judgment.

*Id.* at 722.

Returning to the case at bar, the question was whether appellants were on inquiry notice that the Bridge Loan Program did not exist and that appellants were fraudulently representing that it did. Appellees contend that the inclusion of false gross rental income on Form 1003 should have indicated some level of fraudulent activity. Although we are not persuaded that one mention of false income on a loan application form is necessarily notice that the Bridge Loan Program did not exist, we will not decide that issue. Our inquiry is whether it is a question of law for the court or a question of fact for the jury if appellants were reasonably on notice. As Maryland courts have held, summary judgment is appropriate when statute of limitations is at issue, if there is no dispute of material fact. However, there could be instances when accrual involves questions of fact and law. This case is one such instance. Akin to *Dashiell* and *Frederick Road*, the parties dispute if there were acts that were sufficient to trigger notice in a reasonable person. Additionally, there appears to be some dispute regarding whether the Form 1003 was fraudulent in some way because of appellants' discovery that other leases had been forged. Appellants never affirmatively recalled seeing the gross rental income on the Form. As such, the court's decision that gross rental income should have put them on notice involved the credibility of their testimony. As we explained in *Supik*, when credibility is at issue, the question is one to be decided by the

finder of fact. We conclude that there were genuine disputes of material fact and therefore, the circuit court erred in granting summary judgment.

## 2. Did the circuit court err in granting summary judgment as to the Banking Appellants' SMLL claims?

Before the circuit court, appellants alleged violations of Maryland Code, (1975 Repl. Vol. 2013), §12-403 of the Commercial Law Article [hereinafter Com. Law], known as the Secondary Mortgage Loan Law ("SMLL"). Recently, the Court of Appeals provided a review of the SMLL's background in the opinion of *Thompkins v. Mountaineer Investments, LLC*, No. 43, September Term 2013, slip op. 3-6 (Jun. 23, 2014).

> The SMLL is a consumer protection measure that was designed to incorporate, complement, and prevent circumvention of the usury laws by limiting the interest, fees, and other charges that a lender could collect from a borrower as part of a second mortgage loan on a residential property . . . . The SMLL is codified at Maryland Code, Commercial Law Article ("CL"), §12-401 *et seq*. It sets forth certain requirements that must be followed when a lender[] extends a secondary mortgage loan to a borrower and also restricts in certain respects the terms of the loan . . . . The statute includes various other consumer protection provisions, including prohibitions against false advertising regarding the availability of secondary mortgage loans, against age discrimination in the granting of such loans, and against loan provisions that require the debtor to waive the protections of the SMLL. CL §§12-403, 12-403.1, 12-409. The statute generally prohibits a lender from offering or making a secondary mortgage loan that is not in compliance with the SMLL and, more specifically, from "directly or indirectly" charging or receiving fees forbidden by the statute. CL §§12-411, 12-412.

> Finally the SMLL provides for both civil and criminal enforcement. CL §§12-413, 12-414. The civil remedy provision reads as follows: Except for a bona fide error of computation, if a lender violates any provision of [the SMLL] he may collect only the principal amount of the loan and may not collect any interest, costs, or other charges with respect to the loan. In addition, a lender who knowingly violates any provision of [the SMLL] also

shall forfeit to the borrower three times the amount of interest and charges collected in excess of that authorized by law. CL §12-413. Thus, a lender who violates the SMLL is limited to collecting the principal amount of the loan and is not entitled to collect any interest or other charges. If the violation is "knowing," the borrower can recover a form of treble damages from the lender.

Following the circuit court's grant of summary judgment as to counts I to IX and XI, the Banking Appellees moved for summary judgment as to count X, the alleged SMLL violations. During the prior motion for summary judgment, the parties had agreed that the applicable statute of limitations for the SMLL count was twelve years, so the count was not barred. However, PNC was not a party to the prior motion for summary judgment and as a result, in its motion contended that the SMLL count was subject to a three year statute of limitations under Cts. & Jud. Proc. §5-201. Appellants argued before the trial court that the Banking Appellees had violated the SMLL by falsely advertising the existence of a non-contingent Bridge Loan Program. The circuit court granted summary judgment, after finding that the SMLL did not apply to Ms. Matthews or Ms. Windesheim because they were not lenders; that the communications with Michelle Matthews did not qualify as advertising under the statute; and that the statute was not intended to regulate the type of conduct performed by the Banking Appellees.

On appeal, appellants argue the circuit court erred because by advertising that a non-existent Bridge Loan Program was an option, appellees had falsely advertised loan availability in violation of the SMLL. They also posit that Ms. Matthews and Ms. Windesheim qualify as lenders under the SMLL and that the court erred in its determination

concerning the penalties that appellees would be required to pay. Additionally, PNC maintains that the SMLL claim is barred by limitations and that in the alternative, there is no evidence that it violated the SMLL.

As a preliminary note, the SMLL applies only to secondary mortgages, and therefore, in the instant case, is only applicable to appellants' HELOCs. While the Banking Appellees are comprised of five entities, the SMLL claim could only apply to those parties involved with the HELOCs. Thus, Prosperity and Wells Fargo are not subject to the SMLL because they are parties to this action as a result of their involvement with the primary purchase money loans. PNC provided the HELOCs and Ms. Windesheim was the loan officer for PNC, therefore, both of these parties could be subject to the SMLL. Lastly, Ms. Mathews was the loan officer for Prosperity, which was not covered by the SMLL, but appellants contend that she participated in advertising the Bridge Loan Program, which involved the HELOC. Accordingly, of the five Banking Appellees, we shall consider liability only as to the latter three parties. Finally, appellants contend that due to appellees' actions, their old homes were on the market for a considerable period of time, during which they incurred fees and other charges that they would not have incurred but for the Bridge Loan Program. If appellees are liable under the SMLL, as noted *supra*, appellants could recover up to three times the amount of any interest or other costs associated with the loan. *See* Com. Law §12-413.

### a. Is the SMLL claim subject to a twelve year statute of limitations?

Courts & Judicial Proceedings §5-102 provides:

> (a) *Twelve-year limitation*. – An action on one of the following specialties shall be filed within 12 years after the cause of action accrues, or within 12 years from the date of the death of the last to die of the principal debtor or creditor, whichever is sooner:
>> (1) Promissory note or other instrument under seal;
>> (2) Bond except a public officer's bond;
>> (3) Judgment;
>> (4) Recognizance;
>> (5) Contract under seal; or
>> (6) Any other specialty.

PNC maintains that the traditional three year statute of limitations applies to the SMLL claim because it does not fall under any of the speciality exceptions of Cts. & Jud. Proc. §5-102. *Master Financial, Inc. v. Crowder*, 409 Md. 51 (2009) [hereinafter *Crowder*], was a case in which the Court of Appeals addressed whether a claim brought under several provisions of the SMLL[4] was subject to the twelve year specialty statute of limitations. There, several borrowers brought class actions against several lenders asserting violations of the SMLL and the Consumer Protection Act. *Id.* at 56. The trial court dismissed the action, reasoning that the SMLL claims were barred by the three year statute of limitations. *Id.* The Court of Appeals granted *certiorari* and although neither side argued that the SMLL claims were subject to a twelve year statue of limitations, the Court directed the parties to address the issue. Relying on *Greene Tree H.O.A v. Greene Tree Assoc.*, 358 Md. 453 (2000) and the line of cases which followed, the Court explained the criteria for a claim to be considered a

---

[4] Specifically the plaintiffs alleged violations of Com. Law §§12-401, 12-402, 12-404, 12-405, 12-406, 12-407.1 and sought damages under Com. Law §12-413.

speciality.  Acknowledging that the lawsuits were not seeking to enforce the loans and that all of the claims arose entirely under the SMLL, the Court reasoned that the determination of whether the twelve year limitation applied depended upon whether the SMLL claims were an "other specialty."  The Court explained that in order to satisfy that determination, it had to decide if:

> (1) the duty, obligation, prohibition, or right sought to be enforced is created or imposed solely by the statute, or a related statute, and does not otherwise exist as a matter of common law; (2) the remedy pursued in the action is authorized solely by the statute, or a related statute, and does not otherwise exist under the common law; and (3) if the action is one for civil damages or recompense in the nature of civil damages, those damages are liquidated, fixed, or, by applying clear statutory criteria, are readily ascertainable.

*Crowder*, 409 Md. at 70.  The Court noted that the duties and obligations were solely a product of the SMLL and that the Com. Law §12-413 provided remedies that could only be recovered under the statute and they were fixed and ascertainable.  *Id.* at 72.

PNC asserts that the SMLL claim under Com. Law §12-403 fails the first prong of the speciality analysis because it already exists at common law, specifically as fraud and negligent misrepresentation.  We conclude that a claim brought under Com. Law §12-403 is a specialty and subject to the twelve year statute of limitation.  We find the Court of Appeals decision in *AGV Sports Group, Inc. v. Protus IP Solutions, Inc*., 417 Md. 386 (2010), is instructive.  There, the plaintiffs brought suit asserting violations of the Maryland and federal Telephone Consumer Protection Acts ("TCPA").  *Id.* at 389.  The federal District Court of Maryland certified a question to the Court of Appeals, instructing it to decide if a

claim under the Maryland TCPA was a statutory specialty. *Id.* at 390. The defendant advanced several arguments in support of its claim that the TCPA was not a specialty, among which was the assertion that the first prong of the specialty analysis was not satisfied. *Id.* at 397. The defendant contended that the same rights protected under the TCPA could also be pursued under the common law actions of conversion and trespass to chattels and that in addition, the TCPA permitted a plaintiff to recover unliquidated damages, which violated the third prong. *Id.* The Court agreed with the defendant, and reasoned that the common law actions were sometimes pursued along with TCPA claims. The Court also explained that the TCPA expressly permitted a plaintiff to recover liquidated damages, pursuant to the statute, and unliquidated damages that could be recovered under the common law.

Returning to the instant case, we find the facts of *AGV* distinguishable. Appellants could have pursued a lawsuit under common law fraud and negligent misrepresentation. However, considering the intent of the legislature in enacting the SMLL, the claims are different. The SMLL was enacted to protect the unsophisticated buyer and "achieves this beneficent purpose by penalizing even the unwitting violator, to the extent of limiting him to recovery of the principal amount of the loan." *Thomkinson v. Mortgage Lenders Network USA, Inc.*, 209 Md. App. 685, 696 (2013) (quoting *Duckworth v. Bernstein*, 55 Md. App. 710, 724 (1983)). The common law claims of fraud and negligent misrepresentation must be established by demonstrating that the perpetrator knowingly or intentionally committed

them.[5] Under the SMLL, even an "unwitting violator" can be held liable, indicating that the legislature wanted to expand and not restrict the rights under the common law. A comparison of Com. Law §12-413 with Com. Law §12-403, provides further support that the SMLL is different from fraud and negligent representation. Com. Law §12-413 permits additional recovery by a plaintiff if they can establish that the lender acted knowingly; indicating that one can be liable under §12-403 without acting intentionally. Additionally,

---

[5] In order to establish common law fraud, a plaintiff must demonstrate five elements:

1) that the defendant made a false representation to the plaintiff;
2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth;
3) that the misrepresentation was made for the purpose of defrauding the plaintiff;
4) that the plaintiff relied on the misrepresentation and had the right to rely on it; and
5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Sass v. Andrew*, 152 Md. App. 406, 429 (2003). To establish negligent representation, a plaintiff must show:

(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;
(2) the defendant intends that his statement will be acted upon by the plaintiff;
(3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;
(4) the plaintiff, justifiably, takes action in reliance on the statement; and
(5) the plaintiff suffers damage proximately caused by the defendant's negligence.

*Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 135-36 (2007).

unlike the case in *AGV*, wherein the TCPA provided for liquidated damages but also permitted unliquidated damages, the SMLL only allows a plaintiff to recover interest, costs and other charges related to the loan. Com. Law §12-413. Our conclusion that a claim under Com. Law §12-403 is a specialty statute, is consistent with the Court of Appeals' holdings in *Crowder* and *AGV*.

### b. Are Ms. Matthews, Ms. Windesheim or PNC liable under the SMLL?

Next we turn to the question of the Banking Appellees' potential liability under the SMLL. Commercial Law Article §12-401(b)(2) states that a lender is a "person who makes a secondary mortgage loan" or a licensee of such a person. A person is defined as "an individual, corporation, business trust, statutory trust, estate, trust, partnership, association, two or more persons having a joint or common interest, or any other legal or commercial entity." Com. Law. §12-401(h). Commercial Law Article §12-403, provides:

> (a) A person may not advertise directly or indirectly in the State any false or misleading statement regarding secondary mortgage loans or their availability.

Finally, a lender is subject to civil liability under Com. Law §12-413 if:

> Except for a bona fide error of computation, if a lender violates any provision of this subtitle he may collect only the principal amount of the loan and may not collect any interest, costs, or other charges with respect to the loan. In addition, a lender who knowingly violates any provision of this subtitle also shall forfeit to the borrower three times the amount of interest and charges collected in excess of that authorized by law.

Resolving whether the Banking Appellees' acts were prohibited by the SMLL requires statutory interpretation. In *Thomkinson*, *supra*, 209 Md. App. at 697, we explained that:

[Q]uestions of statutory interpretation are often: "resolvable on the basis of judicial consideration of three general factors: 1) text; 2) purpose; and 3) consequences. Text is the plain language of the relevant provision, typically given its ordinary meaning, *Breslin v. Powell*, 421 Md. 266, 286 [26 A.3d 878] (2011), viewed in context, *Kaczorowski v. City of Baltimore*, 309 Md. 505, 514 [525 A.2d 628] (1987), considered in light of the whole statute, *In re Stephen K.*, 289 Md. 294, 298 [424 A.2d 153] (1981), and generally evaluated for ambiguity. *Kaczorowski*, 309 Md. at 513 [525 A.2d 628]. Legislative purpose, either apparent from the text or gathered from external sources, often informs, if not controls, our reading of the statute. *Kaczorowski*, 309 Md. at 515 [525 A.2d 628]. An examination of interpretive consequences, either as a comparison of the results of each proffered construction, *Christian v. State*, 62 Md.App. 296, 303 [489 A.2d 64] (1985), or as a principle of avoidance of an absurd or unreasonable reading, *Kaczorowski*, 309 Md. at 513, 516 [525 A.2d 628], grounds the court's interpretation in reality."

(quoting *Town of Oxford v. Koste*, 204 Md. App. 578, 585–86 (2012)).

We have explained that the SMLL was enacted as a "legislative approach to consumer protection" *Id.* at 696. It "is a law intended to guard the foolish or unsophisticated borrower, who may be under severe financial pressure, from his own improvidence." *Id.* (quoting *Duckworth v. Bernstein*, 55 Md. App. 710, 724 (1983)).

### i. Were the individual Banking Appellees "lenders" under the statute?

While a person may commit an act that violates the SMLL, they are only subject to liability if they are a "lender" under the statute. Herein lies the dispute regarding Ms. Mathews and Ms. Windesheim. While appellants contend they are lenders, the Banking Appellees assert that they are not. Michelle Mathews was a loan officer for Prosperity. There is no dispute that Prosperity did not fund the HELOCs. Appellants assert that Ms. Mathews was a lender because she was the loan officer who primarily facilitated appellants'

- 26 -

HELOCs.  In cases that applied the SMLL, entities that were considered lenders were the banks that provided the funding.  *See Master Fin., Inc. v. Crowder*, 409 Md. 51, 56 (2009) (plaintiffs brought suit alleging SMLL violations against the entities which originated their secondary mortgages); *Norwest Bank Minnesota, N.A. v. Pence*, 132 Md. App. 363, 365 (2000).  *See also Royal Fin. Servs., Inc. v. Eason*, 183 Md. App. 496, 497 (2008) (lawsuit against a bank which gave the plaintiff a secondary mortgage on her primary residence).  While it is clear that Ms. Mathews was involved in the process, under the intent and language of the SMLL, she was not a lender for its purposes.  As the statute explains, a lender is a "person who makes a secondary mortgage loan."  Although Ms. Mathews was heavily involved in the process,  she was not an employee of the institution that provided the HELOCs.  Therefore, as to Ms. Mathews, we conclude that the circuit court did not abuse its discretion in granting summary judgment.

Suzanne Windesheim, on the other hand, was a loan officer for PNC, the bank that provided the HELOCs to appellants.  As provided in Com. Law. §12-401 a lender is the organization that provided the secondary loan.  Additionally, a person is prohibited from false advertising, and pursuant to Com. Law §12-401, a person can be an individual.  The Court of Appeals has explained that a corporation can only be liable as a result of acts by its employees.  *See Southern Management Corp. v. Taha*, 378 Md. 461 (2003).  In *Taha*, the plaintiff sued his former employer and two employees for malicious prosecution.  *Id.* at 470. The jury found the employer corporation liable but not the employees.  *Id.* at 473.  On appeal,

the question for the Court of Appeals was whether, under the doctrine of respondeat superior, a corporation could be held liable when its employees were exonerated. *Id.* at 478. The Court explained that if an employee is "responsible for the acts about which the complaint is made by the plaintiff, the employer is also responsible since they would have been acting in the course of their employee responsibilities." *Id.* Further expounding upon this principle, the Court opined:

> [H]owever, we have long held that a corporation can act only by virtue of its agents. *See Hecht v. Resolution Trust Co.*, 333 Md. 324, 345, 635 A.2d 394, 405 (1994); *Maryland Trust Co. v. Mechanics Bank*, 102 Md. 608, 629, 63 A. 70, 78 (1906); *Central Railway Co. v. Brewer*, 78 Md. 394, 401, 28 A. 615, 616 (1894); *Carter*, 51 Md. at 295-96 (1879). Corporations have been described as "creature[s] of legal fiction," which are "incapable of tortious conduct" by themselves. *Lokay v. Lehigh Valley Cooperative Farmers*, 342 Pa.Super. 89, 492 A.2d 405, 408, 409 (1985). Because, by themselves, corporations are "dejure persons" and "cannot . . . have a mental state of any kind," they "can only . . . be liable for . . . the mental states of [their] various employees, when they act within the authority given to them." *Louisiana Power & Light Co. v. United Gas Pipe Line Co.*, 642 F.Supp. 781, 803 (E.D.La.1986).

*Id*. at 480. For liability to exist, an employee must be acting pursuant to its employer's authority, which simply means that the act was "incident to the performance of the duties entrusted to the employee by the employer." *Id.* at 481 (quoting *Ennis v. Crenca*, 322 Md. 285, 293-94 (1991)).

Here, because PNC's personhood is a legal fiction, it may only "act" as a result of its employees actions. Although PNC made the HELOCs, Ms. Windesheim was its loan officer who facilitated that process. As the loan officer for PNC, Ms. Windesheim acted

under the auspices of PNC. Furthermore, considering that this Court has previously held that the law is intended to penalize "even the unwitting violator," if Ms. Windesheim falsely advertised the Bridge Loan Program pursuant to her position duties as PNC's loan officer, she may be liable under the SMLL and consequently, so may PNC. Therefore, she is a lender under the SMLL and it is a question of fact whether she violated the statute. We hold that the circuit court erred in granting summary judgment as to Ms. Windesheim.

### ii. Did the Banking appellees violate Com. Law §12-403?

Appellants assert that by misrepresenting the availability of the non-contingent Bridge Loan Program, appellees violated Com. Law §12-403 which prohibits false advertising by lenders. They argue that by advertising the loan as "Home Equity Lines and Loans (to make your client non-contingent)," appellees were advertising the Bridge Loan Program was legitimate when it was not. Prosperity and PNC admitted that a non-contingent Bridge Loan was not a mortgage program offered by either bank. Before the trial court, appellants were unable to present any information establishing that PNC advertised the false loan. The evidence proffered was that PNC indirectly advertised through Ms. Mathews, when she informed appellants of the Bridge Loan Program. PNC denies that it advertised the program.

The SMLL does not define "advertise." However, Commercial Law §13-101 states:

(b)(1) "Advertisement" means the publication, dissemination, or circulation of any oral or written matter, including labeling, which directly or indirectly tends to induce a person to enter into an obligation, sign a contract, or acquire title or interest in any merchandise, real property, intangibles, or service.

Relying on the Commercial Article's definition of "advertise" and on its plain meaning, it

is clear that advertising involves some method of communication to the public. This is further supported by Com. Law §12-403(b), which states that "[t]his section does not apply to the owner, publisher, operator, or employee of any publication or radio or television station which disseminates the statement without knowledge of its false or misleading character." However, we do not believe that advertising is strictly limited to widespread communications. Commercial Law §13-101 permits advertising to be an oral direct or indirect inducement of one into a contract. If this inducement occurs by a lender's dissemination of information to smaller groups of the public, we surmise this could still qualify as an advertisement. For example, two of the plaintiffs contend that they first met Ms. Matthews at an open house and decided to retain her to purchase a new home. We believe that the SMLL is intended to cover advertisement to small groups, such as the circumstances found in the instant case.

An indirect advertisement is advertising that is not performed by the defendant itself but is prohibited because it intentionally results in the same outcome.[6] In *Morris v. Osmose*,

_____

[6] *Cf. Guerand v. Dandelet*, 32 Md. 561 (1870) (affirming a trial court's grant of an injunction finding that a defendant's father had indirectly violated a covenant not to compete. The father entered into a contract and agreed to not directly or indirectly compete with the plaintiff in Baltimore City in the field of dyeing or scouring from any time after the signing of the lease. Several years later, after the lease had expired, the defendant opened a dyeing and scouring business next door to the plaintiff's business under a similar name to his father's business. *Id.* at 565.

The Court explained that by contracting to not directly or indirectly compete with the plaintiff, the father could "neither compete himself, no employ or combine with others to do it. What he [could not] do directly, he [could not] do indirectly." *Id.* at 570. After explaining that the covenant clearly prohibited the father from participating in any way in

(continued...)

340 Md. 519 (1995), the Court of Appeals addressed an issue somewhat similar to this case

at bar. The plaintiffs were several homeowners who had purchased homes with roofs made

of allegedly defective plywood. *Id.* at 526. They contended that the manufacturers of the

wood advertised the wood as suitable for roofs but, in fact, the roofs deteriorated quickly and

created structural integrity problems for the homes. *Id.* at 527-28. The homeowners brought

suit, asserting, among other claims, violations of Maryland Consumer Protection Act which

prohibited unfair and deceptive trade practices.[7] The Act prohibited a seller of consumer

goods from making false, misleading representations and from failing to state material facts

or deceiving a consumer. *Id.* at fn. 9. The Court described the issue as "whether the plaintiff

home buyers may maintain an action against Maryland's Consumer Protection Act against

manufacturers or sellers with whom the plaintiffs had no direct contact." *Id.* at 526. One of

the manufacturers' defenses was that they advertised to commercial buyers, *i.e.*

homebuilders, and not to consumers or homeowners and therefore, the Act could not apply

as to them. *Id.* at 530. The Court agreed with the manufacturers, that the statute was

intended to apply to consumers and not commercial buyers. However, it noted:

> By this we do not mean that the only entity that can engage in a deceptive trade
> practice is one who directly sells or offers to sell to consumers. It is quite

---

[6](...continued)
competition with the plaintiff, the Court opined: "the defendant could, not only not become
interested in any opposition, but that he could not, in any manner, aid or become instrumental
in setting up, or carrying on, an opposition line of stages; and that without such construction,
the word "indirect," employed in the contract, would have no meaning or effect whatever.")

[7] *See* Com. Law §13-303.

possible that a deceptive trade practice committed by someone who is not the seller would so infect the sale or offer for sale to a consumer that the law would deem the practice to have been committed "in" the sale or offer for sale. *See* §13–303. An example may be a deceptive statement appearing on a manufacturer's packaging that is targeted to consumers. Under such circumstances, the CPA may provide a claim against the manufacturer because the statements were made in the sale or offer for sale of the consumer goods. For other examples see *State v. Cottman Transmissions*, 86 Md. App. 714, 587 A.2d 1190 (1991) (permitting CPA action against franchiser who directed franchisee to engage in deceptive practices) . . . .

*Id.* at 541. Continuing, the Court explained that there was no evidence or dispute that the manufacturers did not sell or advertise to the plaintiffs, nor did they exert any influence over the sale or were otherwise involved. *Id.* at 542. The Court then cited cases where plaintiffs were allowed to proceed when the defendants had been accused of indirectly violating a statute. The Court differentiated between those cases, reasoning that the statutes involved all provided that the acts could be performed indirectly in order to subject one to liability.[8] Concluding that the statute at issue did not permit indirect misrepresentations to be used to create liability, the Court declined to hold the manufacturers liable. *Id.* at 544.

---

[8] The Court stated "the consumer's cause of action was allowed to proceed only because specific statutory language made the manufacturer's alleged misrepresentation indirectly a part of the sale to the consumer." *Morris*, 340 Md. at 542. It then cited two cases. In *Jones v. Sportelli*, 166 N.J.Super. 383, 390 (1979), the court applied a statute which defined sale as "any 'attempt directly or indirectly to sell.'" The court in that case found a doctor liable for selling medicine to a customer under the statute even though he did not personally make the sale, but the patient was indirectly charged for the medicine. *Id.* In *Kociemba v. G.D. Searle & Co.*, 680 F.Supp. 1293, 1305 (D. Minn.1988), a federal court found that a Minnesota statute, worded similarly to the one in Jones, permitted a case to proceed against a defendant when it was alleged he indirectly sold medicine to a patient because the statute covered "'direct and indirect' outreaches to the public.'" *Id.*

Appellants contend that not only would Ms. Mathews' conversations with appellants regarding the Bridge Loan Program qualify as advertisements pursuant to the SMLL, but also that the brochures distributed by her company would qualify as well. As was explained above, Ms. Mathews was not a lender and not subject to the SMLL. However, the statute provides that a lender may not indirectly advertise. PNC could be held liable if it could be shown that, through some arrangement, Ms. Matthews actively advertised on behalf of PNC. Appellants contend that a five-step non-contingent Bridge Loan Program was advertised described as a "Buy-First-Sell-Later" process. Additionally, there appears to be no dispute that a non-contingent Bridge Loan does not exist at any of the banks involved. It is a question of fact whether there were any acts that could satisfy the advertisement requirement of Com. Law §12-403. Considering the text of the statute and the context of the SMLL as a whole, the prohibition against false advertising applies to dissemination of information to the public and could include personalized "sales pitches" made by realtors. Accordingly, the circuit court erred in granting summary judgment as to the SMLL claim as to PNC.

**3. Did the circuit court err in denying class certification?**

Appellants filed their complaint as a class action and sought certification for the following class:

- Maryland residents;
- retained The Creig Northrop Team, P.C. to represent them in the purchase of a primary residence ("new home") and the sale of an existing home ("old home") between January 1, 2004 and January 1, 2009;
- received financing for the purchase of their new homes consisting of

- 33 -

(1) a primary purchase money mortgage originated, processed, or funded through Prosperity Mortgage and (2) a home equity line of credit on the old home ("HELOC") through National City;

- Michelle Mathews originated, processed, or funded their primary purchase money mortgage;
- Suzanne Scales Windesheim originated, processed, or funded the HELOC;
- Prosperity Mortgage's records concerning the primary mortgage on the new home reference rental income from the old home as income or an asset of the borrower;  and
- specifically excluded are Brett and Hope Ripkin, whose claims were resolved in the *[Ripkin]* case.

Following a hearing, the circuit court denied appellants class certification, finding that the proposed class was not numerous enough to warrant certification.  On appeal, appellants argue that the circuit court erred in its conclusion and that the court improperly calculated the class size as the number of transactions instead of the number of persons.  In contrast, appellees contend that appellants' estimate was speculative and accordingly, the circuit court did not err in denying class certification.

This Court has explained that the purposes of class actions are "to overcome the impracticalities of overtly cumbersome joinder requirements," and to "promote the objectives of judicial economy and access to the legal system, particularly for persons with small individual claims."  *Christensen v. Philip Morris USA Inc.*, 162 Md. App. 616, 640 (2005) (quoting *Kirkpatrick v. Gilchrist*, 56 Md. App. 242, 249 (1983) and *Philip Morris, Inc. v. Angeletti*, 358 Md. at 732, 752 (2000)).  In order for an action to warrant class certification, it must meet the statutory requirements enumerated in Maryland Rule 2-231(a).

(a) **Prerequisites to a [c]lass [a]ction.** One or more members of a class may

sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

In its order denying class certification, the court found that appellants had met all of the prerequisites except for numerosity. The court explained that the estimated number of transactions was not so numerous that joinder was impracticable and that the method appellants employed to reach their estimate was not sufficient.

In *Philip Morris, Inc. v. Angeletti*, 358 Md. at 732, 752 (2000), the plaintiffs filed a class action against Phillip Morris and other tobacco companies for injuries suffered by using tobacco products. They filed a Md. Rule 2-231 motion for class certification, seeking to certify a class that included all Maryland residents who either personally suffered injuries from conditions caused by smoking or became nicotine dependent after using products sold by the defendants. *Id.* at 700. The court granted their motion and denied the defendants' motion for reconsideration of class. *Id.* at 703. The defendants filed a petition for writ of mandamus and/or writ of prohibition with the Court of Appeals, requesting it to order the circuit court to decertify the classes. *Id.* The Court granted *certiorari*. The Court considered cases from the United States Supreme Court as well as federal circuit and district courts. *Id.* at 725-26. While the party moving for class certification has the burden of establishing that the requirements are met, a court should accept the moving party's allegations as true. *Id.* at 726. The Court explained, "[w]hether numerosity is met depends on a court's practical

judgment, given the facts of a particular case." *Id.* at 732. The plaintiffs did not have an exact number of the proposed class size, but did provide a good faith estimate that it would be at least ten thousand. *Id.* at 732-33. The Court noted that there were only four class representatives in the lawsuit, but accepted the plaintiffs' claim that the litigation would impact possibly hundreds of thousands of Maryland residents. *Id.* at 733. The Court concluded that the numerosity requirement had been met. *Id.*

Maryland Rule 2-231 uses the same language as Federal Rule 23[9], and accordingly, Maryland courts rely on federal cases interpreting Rule 23. *See Jackson v. State*, 340 Md. 705, 716 (1995). Appellants cite *Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 556 (D. Md. 2006) in support of their argument that a proposed class of at least forty is sufficient to meet the number requirement. In that case, the plaintiffs sued the defendant insurance companies for engaging in illegal practices intended to "cheat consumers" with

---

[9] (a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Federal Rules of Civil Procedure, Rule 23.

respect to title insurance acquired during the process of obtaining a mortgage or refinancing their homes. *Id.* at 553. The plaintiffs filed a Fed. Rule 23 motion for class certification. *Id.* at 553. In considering the numerosity requirement, the court noted that "[c]ourts have found classes of as few as forty members sufficiently large to make joinder impracticable." *Id.* at 556. The U.S. District Court found that the first requirement was met, explaining:

> Although [p]laintiffs have not provided the precise number of members in the potential classes, [p]laintiffs assert that based on the level of activity that occurred in the mortgage industry between 2002 and 2005, the number of Maryland borrowers potentially eligible for the reissue rate is considerable; accordingly, [p]laintiffs estimate the number most certainly would exceed the 40 members generally accepted to be sufficiently large to make joinder impracticable.

*Id.*

Appellants also rely on *Hoving v. Lawyers Title Ins. Co.*, 256 F.R.D. 555 (E.D. Mich. 2009), in support of their argument that the court erred in counting the number of transactions instead of the number of persons. There the plaintiff filed suit against the defendant under a theory of unjust enrichment, alleging that the defendant had overcharged the plaintiff for title insurance. He sought to have a multi state class certified. *Id.* at 558. The U.S. District Court noted that "[w]here the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied." *Id.* at 563. It found that the plaintiff had provided enough evidence to establish that his class size was sufficiently large to prohibit joinder. The defendant had performed nearly 850,000 insurance transactions and at least 29% of this number could potentially

qualify for the transactions covered by the proposed class or nearly 250,000 individuals as the court stated.  *Id.*  The court concluded that even if only half of this number were members of the class, the numerosity requirement had been met.  *Id.*

Returning to the case at bar, appellants argue that the court erred in two ways in denying class certification: by counting the number of transactions instead of people, which resulted in a class size of 20 to 34, and by finding that the method used to reach the estimate was not sufficient.  Our task in reviewing the court's denial of class certification is to determine whether "no reasonable person would take the view adopted by the [trial] court." *Mardirossian*, 184 Md. App. at 217.  The court's rationale for finding that the method of calculating the class size was not sufficient is explained below:

> The [c]ourt finds that the [p]laintiffs have not presented sufficient evidence to support their estimate of the size of the class.  There is no acceptable rational for including 2004 in the time period defining the class.  Likewise, it is questionable if 2008 should remain in the time period.  Further, simple extrapolation does not involve concepts of "random sampling" or statistical analysis that result in meaningful data.  It is difficult to even characterize the method used by the [p]laintiffs as producing an educated guess.  Also, the method used by the [p]laintiffs is simple math that does not take variables into account.  The events of recent past, with the rise and fall of the real estate market, are not accounted for when treating each year between 2004 and 2009 as identical in terms of business productivity.  A person looking to buy or sell a home in 2005, 2006 and even 2007 was in for a much different experience than starting in 2008.[]

The court was concerned that the decision of what years to use in calculating the class size did not appear to be a reliable estimate.  The court's concern arose from appellants' own statement during argument on class certification, that they "chose to add a year on each side"

as a "buffer." Despite the court's concerns, it stated: "The [p]laintiffs failed to demonstrate numerosity, however, even if their method of estimating the size of the proposed class is acceptable under the law. The [c]ourt will not consider the year 2004 in determining the issue of numerosity. The [c]ourt, however, will consider 2008 because, if not for any other reason, all of the [d]efendants were employed in the positions they held during the time period of the alleged conspiracy." The court's finding that the method was insufficient was not determinative because the court accepted appellants' method in order to determine numerosity. The court did find that the class size was not large enough, given the insufficient number of transactions. In finding that it would consider the number of transactions instead of the number of individuals, the court noted:

> The [c]ourt first turns to the question of whether to consider a proposed member to be an individual human being or whether to consider a proposed class member to be the transaction. Plaintiff is correct that class members are usually considered as individual persons. That seems appropriate when the alleged behavior impacts persons in an individual manner, even if they are in the same family or living unit. In the instant case, however, the defining characteristics of the class are related to the transaction itself. The vast majority of the transactions that have been identified by the [p]laintiffs have included two persons per transactions. The harm alleged, and the damages sought, are the same in each transaction whether there be one, two or a hundred persons applying for the particular loan.

We conclude that the court did not abuse its discretion in finding that the class size consisted of the number of loan transactions and not the number of parties to the loans. The U.S. District Court stated in *Mitchell* that a class size of forty members can be sufficient to render a class large enough to make joinder impossible. However, the court found that the class size

would likely be between 20 and 34 transactions, and therefore, was not large enough to warrant certification. The facts of this case differ from class actions where the harm suffered is based upon an act directed against an individual person. Here, the act was fraud arising out of each of the loan transactions. We agree with the circuit court that appellees' alleged fraud was committed in relation to each loan. It did not matter how many people were co-borrowers for each loan, but rather that the transaction itself that was allegedly fraudulent. Therefore, we hold that the circuit court did not abuse its discretion in denying appellant's class certification.

**4. Did the circuit court err in striking appellants' second amended complaint?**

Appellants filed a second amended complaint on March 14, 2013. The amended complaint included a new Count XII against Mr. Northrop, the Northrop Team, Long & Foster, and three new parties, Ms. Northrop, Ms. Eagan and Lakeview Title Company, alleging violations of the Real Estate Settlements and Procedures Act ("RESPA")[10]. The new count was based upon the alleged "sham employment" of Ms. Northrop by Lakeview. Appellants alleged that Lakeview paid Ms. Northrop a "salary" but she provided no actual services and the salary was in fact disguised compensation to the Northrop Team for referrals – in essence an illegal kickback. Appellees filed a motion to strike the amended complaint arguing that the second amended complaint was made without leave of the court, that count XII was barred by the statute of limitations, and that appellees would be prejudiced if the

_____

[10] RESPA is codified in 12 U.S.C.A. Chapter 27.

court permitted the addition of a new cause of action and three new parties at the end of discovery. Following a hearing on the matter, the circuit court granted the motion to strike, reasoning that permitting the amended complaint would prejudice the appellees.

Appellants argue that the court erred because the second amended complaint was "timely and appropriate." Appellees respond that the court did not strike the amended complaint on the grounds of timeliness and therefore the argument is baseless. We agree with appellees. The court indicated that prejudice to appellees and the jury was the basis of its ruling. Appellants are not challenging the court's prejudice determination, which was the basis of its denial. Accordingly, because appellants' argument was not the basis of the circuit court's ruling, we decline to review the grant of the motion to strike the second amended complaint.

**5. Did the circuit court err in granting a protective order regarding documents of Ms. Northrop's employment with Lakeview?**

During discovery, appellants served a subpoena with a notice of deposition *duces tecum* on Lakeview. At this time in the litigation, Lakeview was not a party to the case and neither was Ms. Northrop. The subpoena sought in relevant part:

> **Request No. 6**: All documents concerning the payment of compensation or remuneration of any sort by Lakeview Title Company, Inc. to Wells Fargo, Prosperity Mortgage, Long & Foster, Creig Northrop, or the Northrop Team, including any payment to Carla Northrop.

> **Request No. 7:** All documents concerning any agreements and contracts concerning the payment of compensation or remuneration of any sort by Lakeview Title [C]ompany, Inc. [t]o any of the following: Prosperity Mortgage, Wells Fargo, National City, Michelle Mathews, Suzanne

Windesheim, Creig Northrop, The Northrop Team, Long & Foster and Carla Northrop.

The Realtor appellees filed a motion for a protective order, requesting that the court prohibit the disclosure of the above requested information that was not related to appellants' loan transactions. They argued that the requested information was overly broad and that because Lakeview was not a party or mentioned in appellants' complaint, the information was unrelated to appellants' claims. Pursuant to an order from the court, Lakeview submitted the requested documents to the circuit court and the court performed an *in camera* review. Following the *in camera* review, the court granted the motion for protective order and quashed the subpoena. The court found that because neither Lakeview nor Ms. Northrop were parties to the action and none of the documents related to transactions involving any of appellants, that the documents were not responsive to the issues of appellants lawsuit.

On appeal, appellants contend that Ms. Northrop provided testimony, approximately nine months after the grant of the protection order, that rendered the compensation records relevant. They maintain that based on the later testimony, the circuit court's grant of the protective order was an abuse of discretion because the documents were relevant. The Realtor appellees respond that the court's ruling was not an abuse of discretion because at the time Lakeview and Ms. Northrop were not parties to the action and the documents were not related to any claim.

Maryland Rule 2-403 governs protective orders.

(a) **Motion.** On motion of a party, a person from whom discovery is sought,

or a person named or depicted in an item sought to be discovered, and for good cause shown, the court may enter any order that justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (1) that the discovery not be had . . . .

When a party requests a protective order, it is within the purview of the circuit court to first examine the documents *in camera*, in order to determine whether to grant the order. *See Bond v. Slavin*, 157 Md. App. 340, 360 n.31 (2004) ("If the party against whom discovery is sought makes a timely motion for a protective order, the court can examine the relevant documents or information in camera before determining whether a restraining order should issue.").

In *Tanis v. Croker*, 110 Md. App. 559 (1996), the plaintiff and defendant had previously been married to one another. *Id.* at 566. Upon divorce, the court entered a child support order regarding the parties two children. *Id.* at 567. Several years later, the plaintiff sought that the child support be modified. *Id.* During the proceedings, the plaintiff requested that the defendant produce unredacted income tax returns for several years, information regarding a home mortgage he had applied for and information regarding the sale of his home. *Id.* at 572. The defendant filed a motion for a protective order, arguing that he had provided the plaintiff with his W2's which contained the same information as the income tax returns and that some of the information from his mortgage and home sale documents could be used against him in another pending litigation between the two. *Id.* at 573. The court granted the defendant's motion and the plaintiff appealed.

We explained that a "trial court [does] not abuse its discretion when it grant[s a protective order] motion as long as good cause was shown and the order was issued to protect appellee from annoyance, embarrassment, oppression or undue burden or expense." *Id.* at 574. We then turned to federal decisions construing Federal Rule of Civil Procedure 26[11] because Md. Rule 2-403(a) was modeled after that Rule. We noted that the party seeking the protective order had the burden to demonstrate that there would be some harm if the motion was denied. *Id.* We concluded that the defendant did not meet his burden of establishing that he would suffer oppression or an undue burden and accordingly, the court erred in granting the motion.

Returning to the instant case, the circumstances differ from those presented in *Tanis* because the party from which the documents were sought was not a party to the action. Additionally, the information sought was regarding another non-party. The Realtor

---

[11]     (1) *In General*. A party or any person from whom discovery is sought may move for a protective order in the court where the action is pending–or as an alternative on matters relating to a deposition, in the court for the district where the deposition will be taken. The motion must include a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action. The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:

(A) forbidding the disclosure or discovery; . . .

Fed. R. Civ. P. 26 (c)(1).

Appellees argued, and the circuit court agreed, that because the documents sought were not related to a party to the action or related to any of the causes of action asserted in appellants' complaint, that the documents were not relevant. Before this Court, appellants contention that the court abused its discretion rests on events that occurred *after* the motion for protective order. More than one year after the original request for documents from Lakeview and more than six months after the court's grant of the protective order, appellants attempted to add claims against Lakeview and Ms. Northrop in their second amended complaint. They argue that based on Ms. Northrop's subsequent testimony, in which she allegedly contradicted statements made at the time the protective order was at issue, they can establish error on the court's part. We are not persuaded. When the court granted the motion, it could not have known that appellants would attempt to amend the complaint to add causes of action that were relevant to the documents. It's true that the documents were related to appellants' subsequently filed RESPA claims, but when appellants made the discovery request, the documents were not relevant. The court found that because Lakeview and Ms. Northrop were not parties to the action, and the information requested was not related to any of the eleven counts alleged, that the order should be granted. We conclude that the circuit court did not abuse its discretion in granting the motion for protective order.

**JUDGMENTS OF THE CIRCUIT COURT FOR HOWARD COUNTY ARE AFFIRMED IN PART AND REVERSED IN PART. SUMMARY JUDGMENT AS TO COUNTS I THROUGH IX AND XI IS REVERSED. SUMMARY JUDGMENT AS TO COUNT X AGAINST MS. WINDESHEIM AND PNC IS REVERSED. ALL OTHER JUDGMENTS AFFIRMED. COSTS TO BE SPLIT AMONG THE PARTIES.**